**Stacy FRY and Brent Fry, as next friends of minor E.F., Plaintiffs–Appellants,**

**v.**

**NAPOLEON COMMUNITY SCHOOLS; Pamela Barnes; Jackson County Intermediate School District, Defendants–Appellees.**

No. 14–1137.

United States Court of Appeals, Sixth Circuit.

Argued: Oct. 1, 2014.

Decided and Filed: June 12, 2015.

Rehearing En Banc Denied Aug. 5, 2015.*

* Judge Daughtrey would grant rehearing for the reasons stated in her dissent.

**ARGUED:** James F. Hermon, Dykema Gossett PLLC, Detroit, Michigan, for Appellants. Timothy J. Mullins, Giarmarco, Mullins & Horton, P.C., Troy, Michigan, for Appellees. **ON BRIEF:** James F. Hermon, Dykema Gossett PLLC, Detroit, Michigan, for Appellants. Timothy J. Mullins, Kenneth B. Chapie, Giarmarco, Mullins & Horton, P.C., Troy, Michigan, for Appellees.

Before: DAUGHTREY, ROGERS, and DONALD, Circuit Judges.

ROGERS, J., delivered the opinion of the court in which DONALD, J., joined. DAUGHTREY, J. (pp. 631–38), delivered a separate dissenting opinion.

## OPINION

ROGERS, Circuit Judge.

The administrative exhaustion requirements of the Individuals with Disabilities Education Act (IDEA) must, under that act, be met even with respect to some claims under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The question on this appeal is whether the ADA and Rehabilitation Act claims in this case are such claims requiring IDEA exhaustion.

The Frys' daughter, E.F., suffers from cerebral palsy and was prescribed a service dog to assist her with everyday tasks. Her school, which provided her with a human aide as part of her Individualized Education Program (IEP) under the IDEA, refused to permit her to bring her service dog to school. The Frys sued the school, its principal, and the school district, alleging violations of the ADA and the Rehabilitation Act and state disability law. The district court granted the defendants' motion to dismiss under Fed.R.Civ.P. 12(c) on the grounds that because the Frys' claims necessarily implicated E.F.'s IEP, the IDEA's exhaustion provision required the Frys to exhaust IDEA administrative procedures prior to bringing suit under the ADA and Rehabilitation Act. The Frys appeal, arguing that the IDEA exhaustion provision does not apply because they do not seek relief provided by IDEA procedures. But because the specific injuries the Frys allege are essentially educational, they are exactly the sort of injuries the IDEA aims to prevent, and therefore the IDEA's exhaustion requirement applies to the Frys' claims.

Because this is an appeal from a grant of a motion to dismiss based on the pleadings, we take as true the facts alleged in the Frys' complaint. *See S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 479 F.2d 478, 480 (6th Cir.1973).

E.F., the daughter of Stacy and Brent Fry, was born with spastic quadriplegic cerebral palsy, which significantly impairs her motor skills and mobility. In 2008, E.F. was prescribed a service dog. Over the course of the next year, E.F. obtained and trained with a specially trained service dog, a hybrid goldendoodle named Wonder. Wonder assists E.F. by increasing her mobility and assisting with physical tasks such as using the toilet and retrieving dropped items. At the time this dispute arose, E.F. could not handle Wonder on her own, but at some point in the future she would be able to. In October 2009, when Wonder's training was complete, her school, Ezra Eby Elementary School, refused permission for Wonder to accompany E.F. at school. There was already an IEP in place for E.F. for the 2009–2010 school year that included a human aide providing one-on-one support. In a specially convened IEP meeting in January 2010, school administrators confirmed the decision to prohibit Wonder, reasoning in part that Wonder would not be able to provide any support the human aide could not provide. In April 2010, the school agreed to a trial period, to last until the end of the school year, during which E.F. could bring Wonder to school. During this trial period, however, Wonder was not at all times permitted to be with E.F. or to perform some functions for which he had been trained. At the end of the trial period, the school informed the Frys that Wonder would not be permitted to attend school with E.F. in the coming school year.

The Frys then began homeschooling E.F. and filed a complaint with the Office of Civil Rights at the Department of Education under the ADA and § 504 of the Rehabilitation Act. Two years later, in May 2012, the Office of Civil Rights found that the school's refusal to permit Wonder to attend with E.F. was a violation of the ADA. At that time, without accepting the factual or legal conclusions of the Office of Civil Rights, the school agreed to permit E.F. to attend school with Wonder starting in fall 2012. However, the Frys decided to enroll E.F. in a school in a different district where they encountered no opposition to Wonder's attending school with E.F.

The Frys filed suit on December 17, 2012, seeking damages for the school's refusal to accommodate Wonder between fall 2009 and spring 2012. The Frys alleged the following particular injuries: denial of equal access to school facilities, denial of the use of Wonder as a service dog, interference with E.F.'s ability to form a bond with Wonder, denial of the opportunity to interact with other students at Ezra Eby Elementary School, and psychological harm caused by the defendants' refusal to accommodate E.F. as a disabled person. The Frys sought relief under Title II of the ADA, § 504 of the Rehabilitation Act (which prohibits discrimination based on disability in "any program or activity receiving Federal financial assistance"), and the Michigan Persons with Disabilities Civil Rights Act. The district court declined to exercise supplemental jurisdiction over the state law claim.

On January 10, 2014, the district court granted the defendants' motion to dismiss pursuant to Rule 12(c), finding that the IDEA's exhaustion requirements applied to the Frys' claims and dismissing them without prejudice. The court noted that although the Frys did not specifically allege any flaw in E.F.'s IEP, if she were permitted to attend school with Wonder, that document would almost certainly have

to be modified in order to articulate the policies and practices that would apply to the dog. *EF ex rel. Fry v. Napoleon Community Schools,* No. 12–15507, 2014 WL 106624, at *5 (E.D.Mich. Jan. 10, 2014). Therefore, the Frys' request for permission for E.F. to attend school with Wonder "would be best dealt with through the administrative process," and exhaustion was required. *Id.* Because the Frys had not exhausted IDEA administrative remedies, the district court dismissed their suit without prejudice. *Id.* The Frys timely appealed.

■■■■ The IDEA exhaustion requirement applies to the Frys' claims. Under that statute, plaintiffs must exhaust IDEA procedures if they seek "relief that is also available" under IDEA, even if they do not include IDEA claims in their complaint. 20 U.S.C. § 1415(*l*). This language requires exhaustion when the injuries alleged can be remedied through IDEA procedures, or when the injuries relate to the specific substantive protections of the IDEA. *See S.E. v. Grant Cnty. Bd. of Educ.,* 544 F.3d 633, 642 (6th Cir.2008). The core harms that the Frys allege arise from the school's refusal to permit E.F. to attend school with Wonder relate to the specific educational purpose of the IDEA. The Frys could have used IDEA procedures to remedy these harms. Therefore, the nature of the Frys' claims required them to exhaust IDEA procedures before filing suit under the ADA and the Rehabilitation Act.

The IDEA's exhaustion requirement ensures that complex factual disputes over the education of disabled children are resolved, or at least analyzed, through specialized local administrative procedures. The IDEA outlines standards and procedures for accommodations and services provided to disabled children whose disabilities cause them to need "special edu-

cation and related services." 20 U.S.C. § 1401(3)(A). One of its primary purposes is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." *Id.* § 1400(d)(1)(A). To this end, the IDEA requires that schools and school districts develop an IEP for each such child. *Id.* § 1414(d)(2)(A). The IEP outlines "the child's present levels of academic achievement and functional performance[,] . . . measurable annual . . . academic and functional goals," measurement criteria for meeting those goals, and the "special education and related services and supplementary aids and services . . . and . . . the program modifications or supports for school personnel that will be provided for the child" to make progress in achieving the goals. *Id.* § 1414(d)(1)(A)(i).

The IDEA's procedures for creating and amending a child's IEP encourage participation by those directly involved in the child's care in education, application of expert analysis, and swift dispute resolution. There must be an IEP in effect for each disabled child by the start of each school year. *Id.* § 1414(d)(2)(A). The IEP is created by an IEP team, which includes the child's parents, at least one of the child's regular education teachers, at least one of the child's special education teachers, and a representative of the "local education agency" who is qualified in special education, knowledgeable about the general curriculum, and knowledgeable about the local education agency's resources. *Id.* § 1414(d)(1)(B). Any party can present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public edu-

cation to such child," including disputes over the content of the child's IEP. *Id.* § 1415(b)(6)(A); *see id.* § 1401(9)(D) (defining a free appropriate public education as an education "provided in conformity with the individualized education program"). Within 15 days of receiving notice of a child's parents' complaint, the local educational agency must hold a "preliminary meeting" with the parents and other members of the IEP team to give the local educational agency "the opportunity to resolve the complaint." *Id.* § 1415(f)(1)(B)(i). If the local educational agency has not resolved the dispute within 30 days of receiving the· complaint, the timeline for a "due process hearing" begins. *Id.* § 1415(f)(1)(B)(ii). This process must conclude—with the local or state educational agency issuing a written decision to the parties—within 45 days. 34 C.F.R. § 300.515(a). If the local agency conducted the hearing, the decision can be appealed to the state educational agency, which conducts an impartial review and issues a decision within 30 days. 20 U.S.C. § 1415(g); 34 C.F.R. § 300.515(b). These deadlines are of course not entirely set in stone, but in the abstract a dispute about an IEP should go through a resolution meeting, a local agency determination, and a state agency determination within 105 days of the initial complaint. Only at this point may either party take the dispute to court, and the court then receives "the records of the administrative proceedings." 20 U.S.C. § 1415(i)(2). The statute and implementing regulations ensure that the parties have a chance to resolve the dispute without going to court and that local and state educational agencies have a chance to analyze and study it.

Requiring exhaustion of administrative procedures prior to filing suit under the IDEA has clear policy justifications: "States are given the power to place themselves in compliance with the law, and the incentive to develop a regular system for fairly resolving conflicts under the Act. Federal courts—generalists with no expertise in the educational needs of handicapped students—are given the benefit of expert factfinding by a state agency devoted to this very purpose." *Crocker v. Tenn. Secondary Sch. Athletic Ass'n,* 873 F.2d 933, 935 (6th Cir.1989) (analyzing substantially similar provisions of the IDEA's predecessor statute). The IDEA calls for highly fact-intensive analysis of a child's disability and her school's ability to accommodate her. The procedures outlined above ensure that the child's parents and educators, as well as local experts, are first in line to conduct this analysis.

The IDEA's substantive protections overlap significantly with other federal legislation and constitutional protections, and so this policy justification would be threatened if parties could evade IDEA procedures by bringing suit contesting educational accommodations under other causes of action. The IDEA contemplates and explicitly precludes this possibility:

> [B]efore the filing of a civil action under [the ADA, the Rehabilitation Act, or other Federal laws protecting the rights of children with disabilities] *seeking relief that is also available under this subchapter,* the procedures under subsections (f) and ·(g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*) (emphasis added). The exhaustion requirement was intended "to prevent courts from acting as ersatz school administrators and making what should be expert determinations about the best way to educate disabled students." *Payne v. Peninsula Sch. Dist.,* 653 F.3d 863, 876 (9th Cir.2011) (en banc), *overruled on other grounds by Albino v. Baca,* 747 F.3d 1162 (9th Cir.2014) (en banc). Ac-

cordingly, it makes sense to require IDEA exhaustion in order to preserve the primacy the IDEA gives to the expertise of state and local agencies.

■ We have held that exhaustion is not required when the injuries alleged by the plaintiffs do not "relate to the provision of a FAPE [free appropriate public education]" as defined by the IDEA, and when they cannot "be remedied through the administrative process" created by that statute. *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 644 (6th Cir.2014); *see S.E.*, 544 F.3d at 642. When they do relate to the provision of the child's education and can be remedied through IDEA procedures, waiving the exhaustion requirement would prevent state and local educational agencies from addressing problems they specialize in addressing and require courts to 'evaluate claims about educational harms that may be difficult for them to analyze without the benefit of an administrative record. Under *S.E.* and *F.H.*, exhaustion is required at a minimum when the claim explicitly seeks redress for a harm that IDEA procedures are designed to and are able to prevent—a harm with educational consequences that is caused by a policy or action that might be addressed in an IEP. Similarly, the Seventh Circuit required exhaustion when "[b]oth the genesis and the manifestations of the problem [were] educational." *Charlie F. v. Bd. of Educ.*, 98 F.3d 989, 993 (7th Cir.1996). In such a situation, the participants in IDEA procedures will answer the same questions a court would ask, and they have a chance of solving the child's and the child's parents' problem before the parents and their child become plaintiffs.

The exhaustion requirement applies to the Frys' suit because the suit turns on the same questions that would have determined the outcome of IDEA procedures, had they been used to resolve the dispute.

The Frys allege in effect that E.F.'s school's decision regarding whether her service animal would be permitted at school denied her a free appropriate public education. In particular, they allege explicitly that the school hindered E.F. from learning how to work independently with Wonder, and implicitly that Wonder's absence hurt her sense of independence and social confidence at school. The suit depends on factual questions that the IDEA requires IEP team members and other participants in IDEA procedures to consider. This is thus the sort of dispute Congress, in enacting the IDEA, decided was best addressed at the first instance by local experts, educators, and parents.

In the context of the accommodations the school already provided to E.F., the additional value of allowing Wonder to attend with E.F. was educational—the sort of interest the IDEA protects. E.F.'s IEP already included a human aide who, it appears, assisted E.F. with the tasks Wonder could perform. Thus the Frys' claim is not that the school failed to accommodate E.F.'s disability at all, but that the accommodation provided was not sufficient. Whether this claim amounts to alleging a denial of a free appropriate public education, or whether it could be resolved through IDEA procedures, depends on why the existing accommodation was not sufficient relative to what Wonder could provide.

If the human aide was not a sufficient accommodation, it was because he or she did not help E.F. learn to function independently as effectively as Wonder would have and perhaps because he or she was not as conducive to E.F.'s participating confidently in school activities as Wonder would have been. The complaint does not allege that the human aide was less effective than Wonder would have been in providing immediate physical assistance; thus

the Frys do not appear to suggest that E.F. was directly denied physical access to public school facilities. Instead, having Wonder at school was important for E.F. to "form a bond" with the dog, a bond that would make Wonder a more effective service animal "outside of school." The Frys characterize Wonder's independent value to E.F. as assistance with specific physical tasks, enabling her "to develop independence and confidence," and helping her "to bridge social barriers." Thus if the human aide was not a sufficient accommodation relative to Wonder, that was because he or she did not increase E.F.'s ability to perform physical tasks and function confidently and independently outside of school. One might also infer, though the Frys do not allege it directly, that relying on only a human aide without the additional presence of a service dog would inhibit E.F.'s sense of confidence and independence, as well as her ability to overcome social barriers, *in* school.

The other harms that the Frys specifically identify—denial of access to school facilities, denial of the use of Wonder as a service dog at school, harms caused by having to leave the school, and emotional distress caused by the school's refusal to accommodate her—all depend on the assumption that the school's refusal to permit Wonder's attendance harmed E.F. in the ways identified above. For example, E.F. was denied access to school facilities in the sense that school facilities did not provide her with an accommodation (i.e., permission to use Wonder) she reasonably needed, but she needed Wonder in school only (it appears on the face of the complaint) to form a stronger bond with the dog and, perhaps, to feel more confident and independent. In sum, each of these secondary injuries exists only to the extent that Wonder's absence is harmful, or else (in the case of injuries resulting from switching schools, for instance) would be entirely avoidable if Wonder's absence were not harmful.

The primary harms of not permitting Wonder to attend school with E.F.—inhibiting the development of E.F.'s bond with the dog and, perhaps, hurting her confidence and social experience at school—fall under the scope of factors considered under IDEA procedures. Developing a bond with Wonder that allows E.F. to function more independently outside the classroom is an educational goal, just as learning to read braille or learning to operate an automated wheelchair would be. The goal falls squarely under the IDEA's purpose of "ensur[ing] that children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Thus developing a working relationship with a service dog should have been one of the "educational needs that result from the child's disability" used to set goals in E.F.'s IEP. *Id.* § 1414(d)(1)(A)(i)(II). "Educational needs" is not limited to learning within a standard curriculum; the statute instructs the IEP team to take into account E.F.'s "academic, developmental, and functional needs," which means that the IEP should include what a student actually needs to learn in order to function effectively. *Id.* § 1414(d)(3)(A). "A request for a service dog to be permitted to escort a disabled student at school as an 'independent life tool' is hence not entirely beyond the bounds of the IDEA's educational scheme." *Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 248 (2d Cir.2008). The Frys' stated argument for why E.F. needed Wonder at school would have provided justification under the IDEA for allowing Wonder to accompany E.F.

To the extent that the Frys also allege that Wonder would have provided specific psychological and social assistance to E.F. *at* school, the value of this assistance is also crucially linked to E.F.'s education. Accommodations that help make a student feel more comfortable and confident at school should be included in an IEP, which lists "the program modifications or supports for school personnel that will be provided for the child ... to be educated and participate with other children with disabilities and nondisabled children in [educational activities]." 20 U.S.C. § 1414(d)(1)(A)(i)(IV). Thus an IEP should take into account any potential accommodations that will make a disabled child feel more comfortable in the school environment, since such accommodations will help the child participate actively in school activities. The IDEA is designed to address precisely the sorts of harms the Frys allege in their complaint; assuming their claims are correct, they should have been able to obtain relief under IDEA procedures, if followed properly.

In fact, the school did use IDEA procedures to attempt to resolve its dispute, and the injuries alleged by the Frys here could have been raised then. In a January 2010 IEP team meeting requested by the school, E.F.'s IEP team considered, among other questions, "[w]hat disability-related educational need ... the service animal [is] intended to address" and whether "the service animal [will] enhance or hinder [E.F.'s] ability to progress in the general curriculum[.]" The IEP team reached conclusions that pertain directly to the Frys' complaint: "[E.F.] was being successful in [the] school environment without the service animal, ... all of her needs were being met by the program and services in place, and ... adding the service animal would not be beneficial to [E.F.]." These statements either directly contradict the injuries alleged in the Frys' complaint or reflect an excessively narrow conception of educational success contradicted by the text of the IDEA. Either way, the Frys could have relied on the injuries alleged in the complaint here (or on the likelihood of those injuries arising in the future) to challenge the IEP team's conclusion under IDEA procedures.

Had the Frys pursued IDEA procedures at this point, they would have achieved one of two outcomes. Either they would have prevailed and effectively resolved their dispute without litigation, making it possible for E.F. to attend school with Wonder, or else they would have failed but in the process generated an administrative record that would have aided the district court in evaluating their complaint. The IDEA's purposes of giving state educational agencies the opportunity to ensure compliance with federal law and ensuring that local experts are able to analyze disputes before litigation begins are well served by requiring exhaustion here.

First, IDEA procedures would in fact have been capable of resolving the Frys' dispute. E.F.'s IEP already provided for a human aide to accompany her while at school; it could just as well have provided for her service animal. Further, as the Second Circuit in *Cave* has noted in similar circumstances, measures and policies designed to minimize the disruption caused by a service animal at school (a concern raised by school officials in refusing to permit Wonder to accompany E.F.) would also best be addressed through changes to an IEP. 514 F.3d at 247–48. The Frys' complaint alleges a basis under the IDEA for E.F. to attend school with Wonder, and IDEA procedures would have allowed the Frys and school officials to work out exactly how the school should adapt to Wonder's presence.

Second, the record IDEA procedures would have created in this dispute would have been directly relevant to analysis of the Frys' complaint under the ADA and the Rehabilitation Act. In order to prevail in their ADA claim, the Frys would have to show that permitting Wonder at school is "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). Under the allegations in their complaint, this can be the case only because of Wonder's contribution to and role in E.F.'s education—an issue that would be extensively analyzed in IDEA procedures. The Frys would have to make a similar showing under the Rehabilitation Act. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4. Thus the IDEA exhaustion requirement's purpose of allowing courts to benefit from the development of an administrative record also suggests that exhaustion should be required.

■ Although the Frys seek money damages, a remedy unavailable under the IDEA, rather than an injunction, this does not in itself excuse the exhaustion requirement. *F.H.*, 764 F.3d at 643; *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 916 (6th Cir.2000). Otherwise, plaintiffs could evade the exhaustion requirement simply by "appending a claim for damages." 205 F.3d at 917.

It is true that IDEA procedures, which could at best require Ezra Eby Elementary to permit Wonder to accompany E.F. at school, would not at present be effective in resolving the Frys' dispute. First, E.F. no longer attends Ezra Eby Elementary, and her current school and school district permit Wonder to accompany her. Second, before the Frys decided to transfer E.F., the defendants settled the Frys' ADA complaint before the Department of Education's Office of Civil Rights and agreed to permit Wonder to accompany E.F. at

school; IDEA procedures could not have produced a substantially better outcome.

On appeal, the Frys do not argue that, under *Covington*, the above circumstances render exhaustion of IDEA procedures futile. *See* 205 F.3d at 917–18. Indeed, their argument does not rely on the procedural posture of their dispute at all. We therefore cannot decide whether the exhaustion requirement should be excused as futile. However, it is far from clear that the Frys' circumstances satisfy the requirements for futility under *Covington*. In the "unique circumstances" of that case, we distinguished precedent that required exhaustion when relief under IDEA was unavailable due to the plaintiff parents' "unilateral act" of removing their child from the defendant school. *Id.* at 917, 918 (quoting *Doe v. Smith*, 879 F.2d 1340, 1343 (6th Cir.1989)). That is, plaintiffs cannot evade the exhaustion requirement by singlehandedly rendering the dispute moot for purposes of IDEA relief. While that is not exactly the case here, the Frys' failed to use IDEA procedures at any point during the almost two-and-a-half year period in which the school refused permission for Wonder to accompany E.F. The plaintiff in *Covington*, in contrast, participated, albeit imperfectly, in the IDEA's appellate procedures prior to her son's graduating from the school where the dispute arose. *Id.* at 914. The Frys may thus bear some responsibility for the present inapplicability of IDEA procedures, and the futility doctrine may be inapplicable.

In arguing that the exhaustion requirement does not apply to their claim, the Frys rely chiefly on a federal district court decision in California in which the court refused to require exhaustion for a wheelchair-bound student's request for a service dog at school. *Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F.Supp. 947 (E.D.Cal.1990). But applying that case's

logic to this complaint would allow any ADA or Rehabilitation Act lawsuit to avoid the IDEA exhaustion requirement by not explicitly alleging a denial of a FAPE. The decision in *Sullivan* viewed a Rehabilitation Act claim as, in effect, asking questions distinct from those considered by IDEA procedures:

> [O]nce plaintiff has made a threshold showing that her decision to use the service dog is reasonably related to her disability, the sole issue to be decided under section 504 [of the Rehabilitation Act] is whether defendants are capable of accommodating plaintiff's choice to use a service dog. The issue of whether the service dog enhances plaintiff's educational opportunities, which is central to the EHA [the IDEA's predecessor] inquiry, is completely irrelevant under section 504.

*Id.* at 951. This logic does not hold, because, as explained above, having Wonder at school, in addition to a human aide, is "reasonably related" to E.F.'s disability only because Wonder "enhances [E.F.]'s educational opportunities." The analysis that would be necessary under the IDEA thus must be incorporated into the ADA and Rehabilitation Act analysis for the Frys to prevail under the latter statutes. The Frys do not in so many words state that Wonder enhances E.F.'s educational opportunities, but if this is enough to avoid the exhaustion requirement, then any carefully pleaded claim under the ADA or Rehabilitation Act could evade the exhaustion requirement.[1] But the text of the IDEA exhaustion requirement clearly anticipates that the requirement will apply to some ADA and Rehabilitation Act claims. 20 U.S.C. § 1415(*l*). Instead, at minimum, the exhaustion requirement must apply when the cause of action "arise[s] as a result of a denial of a [FAPE]"—that is, when the legal injury alleged is in essence a violation of IDEA standards. *Payne*, 653 F.3d at 875.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.

### DISSENT

The majority proposes to affirm the district court's order dismissing this civil rights action alleging violation of Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act (ADA), based on its conclusion that "the specific injuries the [plaintiffs] allege are essentially educational" and, therefore, subject to administrative exhaustion under an entirely separate statute, the Individuals with Disabilities Act (IDEA). Because I conclude to the contrary that the claim here is noneducational in nature and that the IDEA's exhaustion provision was improperly invoked by the district court, I respectfully dissent. Moreover, even if the accommodation sought could be considered "educational," the fact that school policy

---

1. At oral argument, the Frys proposed a somewhat more nuanced standard based on whether a disabled parent visiting the school would be entitled to the same accommodation as that sought by the student. This test was not articulated in the Frys' briefs, and it does not appear to be fully consistent with *F.H.* and *S.E.* Under those cases, whether a disabled student must exhaust IDEA procedures prior to bringing an ADA or Rehabilitation Act claim for a certain accommodation at school depends on whether the student's allegations relate to the denial of a FAPE or could be resolved through IDEA procedures. That a parent might justifiably claim a similar accommodation when visiting a school does not guarantee that the result of either of those inquiries will be negative, because the parent receives the accommodations in a different context (as an adult visitor, not as an everyday child attendee) and with different consequences.

would permit a "guide dog" on campus, but not a certified "service dog," suggests why an attempt at exhaustion of administrative remedies would be futile in this case and should be excused.

The disability discrimination at issue is a text-book example of the harms that Section 504 and the ADA were designed to prevent, and the claims should not have been dismissed essentially because the victim of the discrimination was a school-aged child. Stacy and Brent Fry's daughter Ehlena, five years old when this dispute first arose in 2009, suffers from a severe form of cerebral palsy that is sufficiently disabling to qualify her under the IDEA for a "free appropriate public education" (FAPE) based on an individualized educational program (IEP)—one specifically "designed to meet [her] unique needs." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.,* 208 F.3d 560, 565 (6th Cir.2000). Parents dissatisfied with a child's IEP are guaranteed "[a]n opportunity ... to present a complaint ... with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). If the complaint cannot be resolved, the parents are entitled to a due-process hearing and, if necessary, an appeal to the state's educational agency. 20 U.S.C. §§ 1415(f)(1)(A), 1415(f)(1)(B)(ii), 20 U.S.C. § 1415(g)(1). Failing ·that, suit against the school district may be filed in federal district court pursuant to 20 U.S.C. § 1415(i)(2).

In this case, the Frys did not attempt to exhaust their administrative remedies under the IDEA because they were not dissatisfied with Ehlena's educational program. Instead, their complaint stemmed from the school district's refusal to allow Ehlena's certified service dog, Wonder, to accompany her to school. Armed with a prescription from Ehlena's physician, the Frys had secured the dog at considerable expense through various community fund-raising efforts even before she started kindergarten, with the understanding that Ehlena would be able to have the service dog accompany her to school in the fall of 2009. In addition, the family had undergone ten days of specialized training at a service-animal training facility in Ohio. The ultimate objective was to form the child and the dog into a "team of two," with Wonder assisting Ehlena in myriad ways, including—but not limited to—"retrieving dropped items, helping her balance when she uses her walker, opening and closing doors, turning on and off lights, helping her take off her coat, [and] helping her transfer to and from the toilet." In short, the goal was to help Ehlena develop more independent motor skills, which is not the function of an academic program—put bluntly, basic mobility is not a subject taught in elementary school. After the Frys completed training, what remained was the task of getting Ehlena and Wonder to become closely attached to one another in order to make the dog a valuable resource for the child, especially during non-school hours. Based on the advice of experts, her parents maintained that for Ehlena to develop the confidence necessary to achieve independent mobility, she and Wonder needed to be together around the clock, including during school hours.

School district officials contended that Ehlena already had an aide provided under her IEP and, therefore, did not need the additional assistance of a service animal. Indeed, they threatened to eliminate the human aide from the child's IEP if her parents insisted on having Wonder accompany Ehlena in school. Even more astounding, the school district refused to recognize Wonder as a service dog despite his official certification, possibly because school policy explicitly allowed "guide

dogs"—but not "service dogs"—on school premises, giving lie to the claim that Wonder was objectionable because he might cause allergic reactions in staff members and students or become a distraction to others.

When officials at Ehlena's school repeatedly refused to accommodate the dog's presence, the Frys filed suit as her next friends, alleging that the school district had violated the child's civil rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 791 *et seq.;* Title II of the ADA, 42 U.S.C. § 12101 *et seq.;* and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 *et seq.*[1] Title II applies to public entities and their programs, prohibiting exclusion from participation by and discrimination against qualified individuals with a disability "by reason of such disability." 42 U.S.C. § 12132. Moreover, ADA regulations require that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would *fundamentally* alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (emphasis added). Similarly, the Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funding and requires reasonable accommodations to permit access to such recipient facilities and programs by disabled persons. *See* 29 U.S.C. § 794(a); 28 C.F.R. § 41.53.

Depending upon a disabled child's circumstances, the two anti-discrimination laws and the IDEA could function as complements, but their focus and the obligations that they impose are independent of one another. The ADA and the Rehabilitation Act guard Ehlena's civil rights,

ensuring that she, like her fellow citizens, has equal access to public facilities and publicly-funded programs. By contrast, the IDEA guarantees that her education will be appropriate for her individual situation. If, for example, the school district declined to permit Ehlena to come to school altogether, that action would violate both the ADA and the Rehabilitation Act, by denying her access to a public facility and its publicly-funded program, and it would also violate the IDEA, by depriving her of a "free appropriate public education." On the other hand, if the school lacked ramps providing access to the building by someone using a wheelchair or walker, rectification of such an ADA violation would not likely be accomplished by modification of an IEP. In short, the ADA's focus is on ensuring *access;* the IDEA's focus is on providing *individualized* education. The point missed by both the district court and the majority is that for Ehlena, Wonder functions as an access *ramp*—not just in terms of the school building but, more significantly, in all aspects of her life.

This point was missed because the test applied below was impossibly broad. In granting the school district's motion to dismiss, the district court observed that "[it] fail[ed] to see how Wonder's presence would not—at least partially—implicate issues relating to E.F.'s IEP." But, this conclusion was based on nothing more than speculation, because the Frys' complaint was dismissed on the pleadings before any discovery could occur. Moreover, in terms of a school-age child, virtually any aspect of growth and development could be said to "partially implicate" issues relating to education. If flimsy, however, the district court's "implication" analysis was at least a test. On appeal, the majority of-

---

1. The state claim was dismissed in the district    court and is not involved in this appeal.

fers no useful yardstick at all. My colleagues appear to formulate something approaching a loose standard, observing that "having Wonder at school, in addition to' a human aide, is 'reasonably related' to E.F.'s disability only because Wonder 'enhances [E.F.]'s educational opportunities.' " But the majority then quickly concedes that her parents "do not in so many words state that Wonder enhances E.F.'s educational opportunities."

Indeed, the Frys' complaint does not tie use of the service dog to Ehlena's academic program or seek to modify her IEP in any way. For this reason, the majority is also incorrect in asserting that "[t]he Frys allege in effect that E.F.'s school's decision regarding whether her service animal would be permitted at school denied her a free and appropriate public education." The Frys did not allege the denial of a FAPE, only Ehlena's access to it. Moreover, given the total absence of discovery in this case, the contention that further accommodation through the service dog is unnecessary because Ehlena already has a "human' aide" simply cannot be taken seriously. The aide provided under the IEP is *not* there to help Ehlena develop and maintain balance and mobility, but to ensure her ability to progress in her academic program. To equate that assistance with the function of the service dog, as the school district did and the majority appears to approve, is ludicrous, and it completely misconceives the purpose of providing an aide under an IEP. Such an aide, after all, would be equally available to assist a special-needs child with no mobility problems at all.

If "implication" and "relatedness" are vague and unhelpful as standards for determining whether a Section 504 claim under the Rehabilitation Act or a Title II claim under the ADA must first be exhausted under the IDEA's administrative procedures, what test should apply? Although the majority quotes statutes at length and cites very little case law, it does invoke the Ninth Circuit's opinion in *Payne v. Peninsula School District*, 653 F.3d 863, 875 (9th Cir.2011) (*en banc*), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir.2014) (*en banc*), for the proposition that "at minimum, the exhaustion requirement must apply when the cause of action 'arise(s) as the result of the denial of a FAPE'—that is, when the legal injury alleged is in essence a violation of the IDEA standards." This proposition is, obviously, true. But it is immaterial, because the Frys neither alleged that Ehlena was denied a FAPE nor asked for a modification of her IEP. Moreover, there is no proof in the record that what the Frys seek to redress is the functional equivalent of a deprivation under the IDEA.

Indeed, what *is* clear from the record— the complaint and attached exhibits—is that the request for a service dog would not require a modification of Ehlena's IEP, because that request could be honored *simply by modifying the school policy allowing guide dogs to include service dogs.* That wholly reasonable accommodation— accomplished by a few keystrokes of a computer—would have saved months of wrangling between Ehlena's parents and school district officials; it would have prevented her absence from public school during the two years she was home-schooled following the school's decision; it would have avoided the disruption of relocating the child and her service dog to another school district; and it would have mooted the question of exhaustion and eliminated the necessity of litigation that has ensued since this action was filed.

On the other hand, if litigation was inevitable, then perhaps the majority in this case should look to the Ninth Circuit's *en*

*banc* opinion in *Payne* for more guidance than merely a restatement of the exhaustion provision found in 20 U.S.C. § 1415(*l* ):

> [T]he exhaustion requirement in § 1415(*l* ) is not a check-the-box kind of exercise. As our cases demonstrate, determining what has and what has not been exhausted under the IDEA's procedures may prove an inexact science. *See Hoeft v. Tucson Unified Sch. Dist.,* 967 F.2d 1298, 1302–03 (9th Cir.1992) (noting that the IDEA's exhaustion requirement "is not a rigid one, and is subject to certain exceptions," determined by "the general purposes of exhaustion and the congressional intent behind the administrative scheme"). In other words, the exhaustion requirement appears more flexible than a rigid jurisdictional limitation—questions about whether administrative proceedings would be futile, or whether dismissal of a suit would be consistent with the "general purposes" of exhaustion, are better addressed through a fact-specific assessment of the affirmative defense than through an inquiry about whether the court has the power to decide the case at all.

*Payne,* 653 F.3d at 870. In summary, the Ninth Circuit held, "[n]on-IDEA claims that do not seek relief available under the IDEA are not subject to the exhaustion requirement, *even if they allege injuries that could conceivably have been redressed by the IDEA.*" *Id.* at 871 (emphasis added). In this vein, the court focused on Congress's intent as explicitly set out in the IDEA itself: "Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities. . . ." 20 U.S.C. § 1415(*l* ). This deliberate carve-out would have no meaning if any and every aspect of a child's development could be said to be "educational" and, therefore, related to a FAPE, requiring inclusion in an IEP, and imposing an extra impediment to the remediation of a disabled child's civil rights. As the *Payne* court noted, " § 1415 makes it clear that Congress understood that parents and students affected by the IDEA would likely have issues with schools and school personnel that could be addressed—and perhaps could only be addressed—through a suit under § 1983 or other federal laws." *Payne,* 653 F.3d at 872.

The majority here has told us that "[d]eveloping a bond with Wonder that allows E.F. to function more independently outside the classroom is an educational goal" but has failed to tell us how it reached this conclusion. The omission is not entirely surprising, given that the *Payne* court identified the Sixth Circuit as one of the "courts [that] have not articulated a comprehensive standard for determining when exactly the exhaustion requirement applies." *Id.* at 874. In developing such a standard for itself, the Ninth Circuit abandoned an injury-centered approach, in which IDEA's exhaustion requirement would apply to any case in which the injuries alleged could be redressed to any degree by the IDEA's administrative procedures, in favor of a relief-centered approach requiring exhaustion in three situations: (1) "when a plaintiff seeks an IDEA remedy or its functional equivalent"—for example, when "a disabled student files suit under the ADA and challenges the school district's failure to accommodate his special needs and seeks damages for the costs of a private school education;" (2) "where a plaintiff seeks prospective injunctive relief to alter an IEP or the educational placement of a disabled student;" and

(3) "where a plaintiff is seeking to enforce rights that arise as a result of a denial of a free appropriate public education, whether pled as an IDEA claim or any other claim that relies on the denial of a FAPE to provide the basis for the cause of action...." *Id.* at 875. Because the Frys do not seek to "alter an IEP" or to rectify "the denial of a FAPE," a court adopting the *Payne* approach would be left with this question: is their request for the service dog under the circumstances of this case "the functional equivalent of an IDEA remedy"?

The answer to this question involves the very purpose of the IDEA's exhaustion requirement, which "is designed to allow for the exercise of discretion and educational expertise by state and local agencies, [to] afford full exploration of *technical educational issues,* [to] further development of a complete factual record, and [to] promote judicial efficiency by giving agencies the first opportunity to correct shortcomings in their *educational programs* for disabled children." *Id.* at 875–76 (internal quotation marks, grammatical alterations, and citation omitted; emphasis added). In short, the exhaustion provision in Section 1415(*l*) is intended to insure that education experts make the "expert determinations about the best way to educate disabled students." *Id.* at 876 (emphasis added).

Clearly, an "expert determination" about "technical educational issues" might well concern whether a handicapped student could be mainstreamed or would fare better in a special-education classroom. It might also concern whether speech therapy would help a child struggling with autism to communicate. And, it might concern whether an intellectually-challenged student could learn to read with the assistance of a reading specialist. But it would *not* concern whether a deaf child should be equipped with a cochlear implant or relegated to learning sign language; whether a blind child should be furnished with a guide dog or outfitted with a white cane; or whether a crippled child should be confined to a wheelchair or encouraged to use a walker *assisted in balance and navigation by a service dog.* The experts qualified to make the "technical decisions" for children in the latter group are obviously *not* trained educators but their physicians and physical therapists. In fact, it was Ehlena's pediatrician who originally assessed her need for a service dog and wrote a prescription that allowed the Frys to provide Ehlena with Wonder. The school district's failure to allow Wonder to accompany Ehlena in school was no different from denying her the use of a wheelchair, if one were needed to enable her to achieve mobility.

Rather than ask a state agency to make that call, the Frys submitted their claim to federal authorities in July 2010, by filing a complaint with the United States Department of Education's Office for Civil Rights (OCR), the federal agency responsible for enforcing Section 504 of the Rehabilitation Act and Title II of the ADA. The complaint was based on the school district's interference with Ehlena's access to its publicly-funded school program by refusing to allow her "trained service animal" to accompany her in school. In a report dated May 3, 2012, the Director of the Office for Civil Rights indicated that current Title II regulations require that "*public entities must modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability.*" Moreover, the regulations in effect at the time defined "service animals" to include "any guide dog or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision,

alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items." The report also notes that a "public entity is required to permit an individual with a disability to be accompanied by the individual's service animal in all areas of a public entity's facilities where members of the public, participants in services, programs, or activities; or invitees, as relevant, are allowed to go."

Addressing Ehlena's situation specifically, the OCR Director summarized a letter from Ehlena's physical therapists:

[T]he therapists explained how the service animal [Wonder] had accompanied the Student to therapy since November of 2009 and had been incorporated into therapy in a number of ways. For example, the service animal assisted the Student with directional control of her walker, with ambulation, and with stabilizing herself while transitioning into and out of her walker from the floor. The Student used the service animal as a bridge for transitioning from her walker to a standing or seated position at a table. She also consistently used the service animal safely to improve her sitting balance by having the service animal provide posterior support as needed. The letter also described how the service animal was directed behind or to the side of the Student when she was standing at a supportive surface for improved safety. Additionally, the Therapists explained that the Student used the service animal to safely pick up dropped items. The letter stated that, although the Student still needed adult stand-by assistance for added safety, her independence with transitioning was improving.

Nevertheless, the OCR Director noted, Ehlena's school district "assert[ed] that the Student does not need her service animal for school, because they will provide her a human aide," but if they do, "it will violate the antidiscrimination provisions of Section 504 and Title II." The Director added:

[T]he decision to deny the Student the service animal in the school setting would have wider implications for the Student outside of the school day. Activities that the service animal performs for the Student during school, such as providing assistance with balance and support, retrieving dropped items, and taking off her coat, are the same types of activities for which the Student uses the service animal outside of the school.... Th[e] evidence suggests that refusing to allow the service animal to assist the Student at school, which she is required to attend for nine months a year, would result in a more prolonged and complete separation that would likely cause the Student's working relationship with the service animal to deteriorate.

When the school district refused to accept the factual findings and the legal conclusions in the OCR report, the Frys filed this action in district court.

It is difficult to fathom what could have been gained by requiring the Frys to undergo additional "exhaustion" before filing suit. The stupefying fact, as noted previously, is that the school district's policy would explicitly have permitted Ehlena to have a guide dog at school if she were blind, but was not interpreted to allow the use of a service dog as a reasonable accommodation for her mobility handicap—even in the face of federal regulations establishing that any distinction between a guide dog and a service dog is purely semantic. Moreover, the school district's recalcitrance suggests a possible reason for the Frys' decision to pass up the bureaucratic

process involved in pursuing Section 1415(*l*) exhaustion as futile, given their repeated efforts to reach a favorable accommodation with the school district officials and their lack of success, even with the OCR report in hand. Of course, we cannot know why the Frys decided to file suit rather than seek a due-process hearing, because the district court dismissed the action on the pleadings, thereby short-circuiting the case before the complaint was answered and discovery could occur.

In my judgment, the district court's dismissal was inappropriately premature. When the court granted the school district's motion for judgment on the pleadings, the pleadings were closed, as required by Federal Rule of Civil Procedure 12(c), but discovery had not been undertaken. And yet, Sixth Circuit case law recognizes that "exhaustion is not required under the IDEA in certain circumstances ... [for example, where] it would be futile or inadequate to protect the plaintiff's rights." *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir.2000) (citing *Honig v. Doe*, 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). Although "the burden of demonstrating futility or inadequacy rests on the party seeking to bypass the administrative procedures," *id.*, the necessity of making such a showing presumes that a plaintiff's civil-rights action setting out Section 504 and ADA claims will proceed at least to the summary judgment stage, as it did in *Covington*. It follows that the district court's order dismissing the Frys' complaint was inappropriate at best, arguably erroneous, and not worthy of affirmance.

At the very least, this case should be remanded to the district court to permit the Frys to attempt a showing that Section 1415(*l*) exhaustion was inapplicable to their case or that it would have been "fu-tile or inadequate." From the majority's decision to affirm, I respectfully dissent.