# United States Court of Appeals
## For the First Circuit

No. 18-1160

RACHEL DOUCETTE, FOR HERSELF AND MINOR SON B.D.; MICHAEL
DOUCETTE, FOR HIMSELF AND MINOR SON B.D.,

Plaintiffs, Appellants,

v.

GEORGETOWN PUBLIC SCHOOLS; TOWN OF GEORGETOWN; ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Judith G. Dein, U.S. Magistrate Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

Carol Ann Kelly, with whom Phillip E. Murray, Jr. and Murray,
Kelly, & Bertrand, P.C. were on brief, for appellants.
Alexandra R. Hassel, with whom Regina M. Ryan and Louison,
Costello, Condon & Pfaff, LLP were on brief, for appellees.

August 26, 2019

**LIPEZ**, <u>Circuit Judge</u>.  Rachel and Michael Doucette sued Georgetown Public Schools, the school committee, the town, and certain school district employees (collectively, "the school district") on behalf of their severely disabled child, B.D.  The Doucettes alleged that the school district deprived B.D. of his service animal and subjected him to a dangerous environment in violation of federal and state law, thereby causing B.D. to experience seizures and hospitalization.  They sought money damages for alleged permanent physical and emotional harm to B.D., as well as for loss of consortium to the parents.

The school district moved for judgment on the pleadings, arguing that the Doucettes had failed to exhaust their federal claims -- a Rehabilitation Act claim and a substantive due process claim under 42 U.S.C. § 1983 -- through the administrative procedures prescribed by the Individuals with Disabilities Education Act ("IDEA").  <u>See</u> 20 U.S.C. §§ 1400–1491<i>o</i>; 1415(<i>l</i>).  The IDEA requires exhaustion -- i.e., resort to the administrative process -- before a plaintiff may bring a civil action pursuant to other federal laws protecting the rights of disabled children if the relief sought is from the denial of a free appropriate public education.  <u>See</u> 20 U.S.C. § 1415(<i>l</i>).  The administrative process culminates in an impartial due process hearing conducted by the

state educational agency or the local educational agency, as determined by the state.  See 20 U.S.C. § 1415(f).[1]

Agreeing that the Doucettes' federal claims were subject to the IDEA's exhaustion requirement, the district court[2] granted the school district's motion as to those claims and remanded the Doucettes' state law claims to state court.  We vacate that decision.  Guided by the Supreme Court's decision in Fry v. Napoleon Community Schools, 137 S. Ct. 743 (2017), and principles of exhaustion, we conclude that the gravamen of the Doucettes' Rehabilitation Act claim does not involve the denial of a free appropriate public education.  As to the Doucettes' § 1983 claim, we conclude that it either was exhausted or that continued engagement with the IDEA's administrative scheme would have been futile.  Hence, no further administrative pursuit was required for the § 1983 claim.

**I.**

B.D. has Isodicentric Chromosome 15q Duplication Syndrome ("15q Duplication Syndrome"), a rare genetic disorder,

---

[1] In Massachusetts, the impartial due process hearings are conducted by the Massachusetts Bureau of Special Education Appeals.  See Mass. Gen. Laws ch. 71B, § 2A.

[2] With the consent of all parties, the case was assigned to, and proceeded before, a United States Magistrate Judge, in accordance with 28 U.S.C. § 636(c) and Rule 73(b) of the Federal Rules of Civil Procedure.

which manifests differently among affected persons.[3]  In B.D.'s case, the syndrome manifests as developmental delay, frequent choking, vision problems, difficulties in balance, aggression, cognitive impairment, communication deficits, autistic spectrum disorder, epilepsy, and anxiety disorder, among other problems. In addition to causing these symptoms, B.D.'s disorder increases his risk of sudden unexpected death -- a risk correlated with seizure activity in children with 15q Duplication Syndrome.

B.D. attended Perley Elementary School ("Perley") from July 2009 until August 2012, when he was between the ages of three and six years old.  Given his disabilities, he had an individualized education program ("IEP"),[4] which required, among other things, that he receive a consistent routine, a seizure plan,

---

[3] We draw these facts from the well-pleaded facts of the complaint, which we must take as true.  Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).

[4] An IEP is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).  The plan is "[c]rafted by a child's 'IEP Team' -– a group of school officials, teachers, and parents."  Fry, 137 S. Ct. at 749 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)).  Most notably for this case, a child's IEP lists "the special education and related services" to be provided to the child so that he receives a free and appropriate education. See 20 U.S.C. § 1414(d)(1)(A).

and one-on-one assistance, and that he participate in an extended-school year ("ESY") program.[5]

B.D.'s parents were dissatisfied with the services provided to B.D. at Perley. Within months of his arrival, they began complaining to administrators, teachers, and the superintendent. In the spring, they met with his IEP team to formally request a change to B.D.'s IEP, which was denied. In the weeks that followed, they continued to convey concerns, noting that B.D. was at times unsupervised, was bolting from class, and, on one occasion, fell and hit his head. Due to these concerns, the Doucettes removed B.D. from Perley, and he remained out of school from May to September 2010.

In July 2010, while B.D. was out of school, the Doucettes requested a hearing before the Massachusetts Bureau of Special Education Appeals ("BSEA"), seeking an amendment to B.D.'s IEP and an out-of-district placement for him. The hearing was held at the end of August, and, a month later, the BSEA hearing officer issued a decision. Although the hearing officer found that B.D.'s IEP was inadequate, the officer found that an out-of-district placement was unwarranted, and ordered a new IEP for B.D. B.D. then returned to Perley in the fall of 2010 with an amended IEP.

---

[5] An ESY program is a summer school program for students who require year-round schooling to minimize substantial regression and reduce substantial recoupment time. See Todd v. Duneland Sch. Corp., 299 F.3d 899, 902, 907 (7th Cir. 2002).

During the 2010-2011 school year, the Doucettes continued to be dissatisfied with the implementation of B.D.'s IEP. B.D. began having "staring spells with eye rolling," symptomatic of potential seizure activity. And, although B.D.'s amended IEP included a safety and seizure plan, one of B.D.'s teachers indicated to B.D.'s mother that she was unaware of the plan.

In the fall of 2011, B.D. began working with a certified service dog that assisted him with his anxiety and balance, and alerted his caretakers to an impending seizure.[6] In November of that year, the Doucettes requested that the school district permit the dog to accompany B.D. at school as a disability accommodation. The school district refused. When B.D.'s staring spells and anxiety increased, however, the school district offered him at-school access to the service animal if the Doucettes agreed to a school policy regarding the dog's handling. The Doucettes refused to sign this agreement, which they claim violated the Americans with Disabilities Act ("ADA"). They demanded that the district comply with the ADA. The school district then denied B.D. access

_____

[6] A service dog is "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability." 28 C.F.R. § 36.104 "Examples of [such] work or tasks include, but are not limited to . . . assisting an individual during a seizure, . . . providing physical support and assistance with balance and stability, . . . and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors." Id.

to the dog but ordered a behavioral assessment, to take place the next fall (i.e., fall of 2012), to determine whether B.D.'s IEP should be amended to include the service dog.

That summer, as part of the school district's ESY program, B.D. was placed in an unfamiliar building, with unfamiliar equipment, teachers, and sounds, including "gushing sounds from exposed pipes," and "the barking of the Guidance Counselor's pet dog." At this time, he experienced his first tonic-clonic seizure,[7] lasting over twenty minutes and requiring hospitalization. After the seizure, the Doucettes demanded an immediate amendment to B.D.'s IEP to grant him access to his service dog at school. Their request for an IEP amendment to include the service animal was denied, but the school district granted B.D. permission to use the dog at school if his mother would act as its handler.

The Doucettes contest the adequacy of that arrangement to fulfill the school district's obligation to accommodate B.D. under section 504 of the Rehabilitation Act. Although not

---

[7] A tonic-clonic seizure is a seizure of a serious nature, which is characterized by a loss of consciousness, and involves muscular contractions and relaxations in rapid succession. See H. Gastaut, Dictionary of Epilepsy: Part I 67 (World Health Organization, ed. 1973). A tonic-clonic seizure lasting over five minutes is a "life-threatening medical emergency requiring immediate medical help." See *Tonic-Clonic Seizures*, Epilepsy Ontario, http://epilepsyontario.org/about-epilepsy/types-of-seizures/tonic-clonic-seizures (last visited May 6, 2019).

- 7 -

specifically stated in the complaint, we infer that the service dog did not then begin accompanying B.D. at school -- at least not on a regular basis. The Doucettes' section 504 claim is premised on B.D.'s denial of access to his service animal, which they say caused B.D. to "sustain five seizures in July, August, and September of 2012." The school district does not argue that the service animal accompanied B.D. at school during these seizures, but that "four of the five seizures suffered by B.D. occurred after he was permitted to bring his service dog to school."

The Doucettes' complaint likewise provides no specific details as to why the Doucettes felt that the school's handling policy violated the ADA. As a rule, the ADA requires a public entity to "modify its policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 35.136(a). In addition, a public school may, in some instances, violate disability laws by requiring a student to provide an outside adult handler to accompany the student and her service animal at school. See, e.g., Alboniga v. Sch. Bd., 87 F. Supp. 3d 1319, 1342 (S.D. Fla. 2015). In a sentence in its brief, the school district states, "[T]he [Doucettes'] [c]omplaint does not sufficiently plead that the District outright denied B.D. access to his service dog; instead, the facts establish that the District had developed a policy . . . regarding the handler for

the service dog . . . which the Parents refused to sign."  The school district does not further develop this argument.[8]

In addition to demanding that the school grant B.D. access to his service animal at school, B.D.'s mother also complained to the school district about the changes in her son's program and requested a meeting with his IEP team.  Two weeks later, B.D. experienced a second tonic-clonic seizure while in an unfamiliar environment and under the supervision of a substitute teacher.  After this second seizure, the Doucettes requested an alternative school placement for B.D.  Their request was denied.

In the following weeks, B.D. suffered two more tonic-clonic seizures, each requiring a hospital stay.  After the fourth seizure, the Doucettes removed B.D. from school and again requested an alternative school placement.  They explained that "B.D. had had four [tonic-clonic] seizures in his lifetime, all of which happened in school [in the last month]," and that B.D.'s placement was "not only inappropriate but unsafe."  They also presented the school district with a letter from B.D.'s doctor stating that the current placement was "inadequate in terms of managing [B.D.'s]

---

[8] Whether the handling agreement placed unreasonable or unlawful conditions on B.D.'s access to his service animal such that he was effectively denied access by the school district will undoubtedly be an important issue to the future viability of the Doucettes' section 504 claim, but it is not an issue in this appeal.

seizures," expressing concerns regarding the "school's ability to handle [B.D.'s] health and safety," and recommending, "[g]iven the severity of [B.D.'s] anxiety in his [then] classroom setting, and the subsequent effect on his epilepsy and overall health," that B.D. be kept out of school until a safe placement was identified. Still, the school district refused to provide an alternative placement for B.D. and advised the Doucettes that B.D. was expected to attend school on September 5, 2012, and that "extended absences [would] be considered truancy."

On September 5, 2012, the Doucettes returned B.D. to Perley. That same day, he suffered a fifth tonic-clonic seizure, requiring hospitalization. After the fifth seizure in a three-month period, the school district agreed to evaluate an out-of-district placement for B.D. Subsequently, the district agreed to the new placement, where B.D. has made "developmental and educational progress." B.D. has experienced no seizures since his removal from the school district.

In 2015, the Doucettes filed suit alleging state law tort claims, as well as claims under section 504 of the Rehabilitation Act and 42 U.S.C. § 1983. The district court entered judgment against the Doucettes on their federal law claims on the basis of the Doucettes' failure to exhaust the IDEA's administrative remedies and declined to exercise pendent jurisdiction over the remaining state law causes of action. In

this appeal, our review is de novo, Gulf Coast Bank & Co. v. Reder, 355 F.3d 35, 37 (1st Cir. 2004), and we "draw[] all reasonable inferences in favor of the plaintiff[s]." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007).

## II.

### A. The IDEA

The IDEA is a federal statute ensuring that children with disabilities "have available to them a free appropriate public education," commonly referred to as a "FAPE." 20 U.S.C. § 1400(d)(1)(A). A FAPE encompasses "both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." Fry, 137 S. Ct. at 748 (quoting 20 U.S.C. § 1401(9), (26), (29)). A disabled child's IEP -- her written education plan -- is the "primary vehicle" for providing the mandated FAPE. Id. at 749 (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)).

The IDEA provides an administrative process for parents to challenge their child's IEP or its implementation. This process begins with a preliminary meeting or mediation with the child's IEP team, and, if the dispute remains unresolved, progresses to a "due process hearing" before an impartial hearing officer. 20 U.S.C. § 1415(b)-(f). Such officer may grant relief based upon "a determination of whether the child received a [FAPE]." Id. § 1415(f)(3)(E)(i). Before a parent sues a school under the IDEA,

- 11 -

she must first "exhaust [the] administrative remedies through the due process hearing [provided for by the IDEA]." Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000); see 20 U.S.C § 1415(i)(2)(A). Although exhaustion of IDEA claims is the general rule, it "is not absolute." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 59 (1st Cir. 2002). Fundamentally, rules requiring administrative exhaustion are not meant to be enforced in a manner that would require "empty formalit[ies]." See Panetti v. Quarterman, 551 U.S. 930, 946 (2007). Plaintiffs are not required to exhaust administrative remedies under the IDEA when exhaustion would be futile. Id.

**B. Other Federal Laws and the IDEA's Exhaustion Requirement**

This case concerns claims under laws other than the IDEA that protect the rights of persons like B.D. Specifically, the Doucettes allege violations of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983. Section 504, like the IDEA, covers the disabled; it, however, "cover[s] both adults and children with disabilities, in both public schools and other settings," Fry, 137 S. Ct. at 749 (emphasis added), and requires that a public entity make "reasonable modifications" to existing practices, including by offering support services, to "accommodate" disabled persons, Alexander v. Choate, 469 U.S. 287, 299-300 (1985); see, e.g., C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 832 (2d Cir. 2014) (discussing support services

available under section 504).[9]  Section 1983 applies even more broadly, protecting every "[c]itizen of the United States or other person within [its] jurisdiction" against the deprivation of a federally secured right by a person acting under the color of state law.  42 U.S.C. § 1983.

The IDEA's exhaustion requirement is relevant to claims brought under these laws because the IDEA contains a provision, § 1415(*l*), which concerns the relationship between the administrative procedures specified in the IDEA and claims brought under such laws. It provides:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution . . ., title V of the Rehabilitation Act [including Section 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*).[10]

---

[9] The Rehabilitation Act of 1973, 29 U.S.C. § 701, is one of the two primary federal anti-disability-discrimination laws.   The other is the ADA.  See 42 U.S.C. § 12101.  The Rehabilitation Act, the older of the two, guarantees disabled persons non-discriminatory access to federally funded facilities, activities, and programs.  See 29 U.S.C. § 794.   The more comprehensive ADA likewise guarantees disabled persons non-discriminatory access to public facilities, 42 U.S.C. § 12132, and also extends those protections to commercial facilities and places of public accommodation.  See 42 U.S.C. §§ 12181-12189.

[10] The dissent cites Frazier, 276 F.3d at 60, to describe a "robust" IDEA exhaustion requirement contemplated by Congress in

- 13 -

The Supreme Court recently addressed the reach of this exhaustion provision for the first time in Fry v. Napoleon Community Schools, finding that it only applies to lawsuits seeking "relief for the denial of a FAPE." 137 S. Ct. at 752; see also id. at 754. Under Fry, if a school "refus[ed] to make an accommodation" for a disabled child, "injuring [the child] in ways unrelated to a FAPE," a plaintiff "seeking redress for those other harms . . . is not subject to § 1415(*l*)'s exhaustion rule." Id. at 754–55.

The Fry Court provided guidance for analyzing whether a lawsuit seeks relief for the denial of a FAPE, explaining that "a court should look to the . . . gravamen[] of the plaintiff's complaint" -- not "the labels used in [it]." Id. at 752, 755. The Court then noted two clues that indicate that the gravamen of a complaint is the denial of a FAPE. The first clue comes from the answers to a pair of hypothetical questions: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school?"

_____

20 U.S.C. § 1415(*l*). However, Frazier's exhaustion analysis is of questionable precedential value because it relied on a Supreme Court case addressing exhaustion in the context of the Prison Litigation Reform Act ("PLRA"). See id. at 61-62 (citing Booth v. Churner, 532 U.S. 731 (2001)). In Fry, the Supreme Court rejected this comparison between the IDEA and the PLRA, highlighting the differences in language between the two standards and explaining that the IDEA's exhaustion standard is more forgiving. Fry, 137 S. Ct. at 755.

and (2) "could an <u>adult</u> at the school . . . have pressed essentially the same grievance?" <u>Id.</u> at 756. When the answer to each question is no, the complaint "probably does concern a FAPE." <u>Id.</u> On the other hand, if the answers are yes, a FAPE is unlikely the true subject of the complaint. <u>Id.</u> The second clue involves the history of the case; a plaintiff's previous invocation of the IDEA's formal procedures may "provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE." <u>Id.</u> at 757.[11]

## III.

The Doucettes contend that the IDEA's exhaustion requirement does not apply to their claims because the gravamen of their claims is not the denial of a FAPE or, in the alternative, exhaustion was not required because it would have been futile or because they already met the exhaustion requirement. Applying the <u>Fry</u> framework to each of the Doucettes' claims, <u>see</u> <u>Wellman</u> v. <u>Butler Area Sch. Dist.</u>, 877 F.3d 125, 132-33 (3d Cir. 2017)

---

[11] Instead of relying on the clues articulated by the <u>Fry</u> majority, so central to its analysis of the exhaustion requirement, <u>see</u> <u>Fry</u>, 137 S. Ct. at 756-57, the dissent embraces Justice Alito's critique of those clues as "misleading" in his concurrence. <u>Id.</u> at 759 (Alito, J., concurring in part and concurring in the judgment). We do not ordinarily grant primacy to a concurrence over a majority opinion. The dissent also criticizes the <u>Fry</u> majority opinion as "not a model of clarity." We do not share the dissent's confusion about the meaning or applicability of <u>Fry</u>. Nor, apparently, do the five other members of the Supreme Court who joined Justice Kagan's opinion without reservation. <u>See</u> <u>id.</u> at 748-59.

- 15 -

(endorsing a claim-by-claim approach to the Fry analysis); see also Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775, 785 (10th Cir. 2013) (employing a claim-by-claim approach to analyzing IDEA exhaustion), we conclude that (1) exhaustion was not required for the Doucettes' section 504 claim because the crux of the claim is not the denial of a FAPE; and (2) although the crux of the Doucettes' § 1983 claim is the denial of a FAPE, that claim is properly brought in federal court because it either was exhausted or further invocation of the administrative process would have been futile.

## A. The Section 504 Claim

The Doucettes allege that the school district violated section 504 by "refus[ing] to permit B.D. access to his service dog . . . despite having knowledge that B.D. qualified as an individual with disabilities [who] relied upon the service dog." They assert that B.D. suffered life-threatening seizures because of the deprivation, and they seek money damages for associated medical costs.

The gravamen of this claim -- B.D., a disabled child, was denied access to his seizure-alert service dog, and, as a result, suffered seizures -- is not the denial of a FAPE. Instead, it is "simple discrimination, irrespective of the IDEA's FAPE obligation." Fry, 137 S. Ct. at 756. In reaching this conclusion, we "attend to the diverse means and ends of . . . the IDEA . . .

- 16 -

and [the] Rehabilitation Act." Id. at 755. "The IDEA guarantees individually tailored educational services, while . . . [section] 504 promise[s] non-discriminatory access to public institutions," id. at 756, "sometimes by means of reasonable accommodations," id. To be sure, there is "some overlap in coverage" between the statutes. Id.[12] But here the section 504 claim, grounded in the refusal of the school district to reasonably accommodate B.D.'s use of the service dog (that is the allegation), involves the denial of non-discriminatory access to a public institution, irrespective of the school district's FAPE obligation to provide a particular education program for B.D.

The hypotheticals provided by the Fry Court in explaining its first clue support this conclusion.[13] The

---

[12] Any child who is entitled to an IEP under the IDEA is also protected by section 504, but the inverse is not true. As one court explained:

> [I]t is well recognized that Section 504 covers more students than does the IDEA. Students with disabilities who are eligible for services under IDEA are also covered by the prohibitions against discrimination on the basis of disability in Section 504 and its implementing regulation at 34 CFR Part 104, but students covered only by Section 504 are not entitled to the rights and protections enumerated by IDEA and its implementing regulations at 34 CFR Part 300.

S. v. W. Chester Area Sch. Dist., 353 F. Supp. 3d 369, 375 n.1 (E.D. Pa. 2019) (quoting Molly L. ex rel. B.L. v. Lower Merion Sch. Dist., 194 F. Supp. 2d 422, 427 n.3 (E.D. Pa. 2002)).

[13] Distinguishing between a complaint's explicit and implicit focus on the adequacy of a child's education, the dissent argues that Fry used the clues only to discern an "implicit focus on educational adequacy." The dissent misreads Fry, imposing on its

- 17 -

deprivation about which the Doucettes complain (deprivation of a service animal) might occur in a public facility that is not a school, and a non-student could "press[] essentially the same grievance." Id. at 756; see, e.g., Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1204 (11th Cir. 2007) (concerning similar claim brought in hospital setting); see also 28 C.F.R. § 36.302(c)(1) (requiring that places of public accommodation "modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability"); 28 C.F.R. pt. 36, app. C. (providing for "the broadest feasible access . . . to service animals in all places of public accommodation, including

---

analysis a limitation that is not there. We use the clues precisely as the Court instructed -- to assist our determination of the gravamen of the Doucettes' section 504 claim, i.e., "whether the gravamen [is] the denial of a FAPE, or instead [] disability-based discrimination." 137 S. Ct. at 756. Indeed, the dissent's test -- whether an implicit or explicit "focus on the adequacy of education" can be identified in the complaint -- mirrors the Sixth Circuit test rejected by the Fry Court. The Sixth Circuit had determined that the Frys' complaint concerning the denial of a service dog was subject to IDEA exhaustion because "the harms to [the plaintiff] were generally 'educational' -- most notably, the court reasoned, because [the Fry family had alleged that] '[the service dog']s absence hurt [their child's] sense of independence and social confidence at school.'" Fry, 137 S. Ct. at 752 (quoting 788 F.3d 622, 627 (6th Cir. 2015)). The Supreme Court vacated that judgment, ruling that the Sixth Circuit had applied the wrong test. Instead, courts must ask not whether a claim is "educational," but whether it "charges, and seeks relief for, the denial of a FAPE." Id. at 758. Though the Fry Court discusses the difference between explicit and implicit references to a FAPE, that discussion does not remotely suggest that the clues are only useful for discerning an implicit focus on educational adequacy. See id. at 758-59 (remanding for development of a factual record concerning the history of the Frys' request for a service animal).

- 18 -

movie theaters, restaurants, hotels, retail stores, hospitals, and nursing homes"); cf. AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11, 538 F. Supp. 2d 1125, 1152 (D. Minn. 2008) (no requirement of exhaustion where section 504 claims were for failure to accommodate diabetic student's need for administration of insulin).[14]

The complaint's express allegations of FAPE deprivation and inadequate educational services do not require us to find otherwise.[15] The Supreme Court counseled against a "magic words" approach to the IDEA exhaustion inquiry. Id. at 755. What matters is not whether "a complaint includes (or, alternatively, omits) the precise words[] 'FAPE' or 'IEP,'" but rather whether a claim in fact "seeks relief for the denial of an appropriate education." Id. The allegations of FAPE deprivation are, as the Doucettes

---

[14] The fact that a non-student could assert the same claim as the Doucettes distinguishes the circumstances here from the facts in Wellman -- a case emphasized by the dissent -- where the court noted that the claims all related to fulfilling the student's "educational needs," 877 F.3d at 133, and, hence, "could not be brought by a nonstudent or outside the school setting," id. at 134.

[15] The complaint, for instance, alleges that, following the August 2010 BSEA hearing concerning B.D.'s out-of-district placement, the BSEA officer found the school district's "proposed IEP was not . . . reasonably calculated to provide B.D. with a free and appropriate public education ("FAPE")," and alleges, as a basis for its § 1983 claim that, "[a]s a result of the [school district's] deliberate indifference . . . B.D. was deprived of a free and appropriate education."

argue in their brief, "germane to . . . their state law claims and their section 1983 claims."

The Doucettes' complaint does not assert inadequate education services as a basis for relief under section 504. Rather, the Doucettes identify the school district's knowing "refus[al] to recognize B.D.'s service dog as such" and the resulting "life-threatening" harm to B.D. as the basis for their section 504 claim. They assert that the refusal to recognize B.D.'s dog as a service dog denied B.D. safe access to his school. Their section 504 claim "is subject to exhaustion or not based on that choice," and not on other claims that the Doucettes might have brought. Fry, 137 S. Ct. at 755; see also Wellman, 877 F.3d at 132 ("To apply the Fry test without consideration of the actual claims could result in situations where claims that are included in a complaint because they involve the same parties or course of events but do not involve the provision of a FAPE get swept up and forced into administrative proceedings with claims that are seeking redress for a school's failure to provide a FAPE.").

Furthermore, although the Doucettes previously invoked the IDEA's formal procedures when they participated in an administrative hearing before the BSEA in August 2010, that hearing, which concerned alleged violations of B.D.'s IEP during the 2009-2010 school year, was unrelated to B.D.'s request for

access to his service animal, which he did not begin to use until November 2011.  As such, the Doucettes' participation in the BSEA hearing is not "evidence that the substance of [the] plaintiff[s'] [section 504] claim concerns the denial of a FAPE."  Fry, 137 S. Ct. at 757.

Finally, the Doucettes' July 2012 request for an IEP amendment to include B.D.'s service animal is not proof that the crux of their section 504 claim was "really" the denial of a FAPE. Indeed, the Supreme Court in Fry expressly recognized that the fact that a particular dispute was addressed in some way in IDEA proceedings does not determine the character of that dispute.  "[A] court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely."  Id. at 757; see also id. at 759 (Alito, J., concurring in part and concurring in the judgment) (explaining that a parent's invocation of the IDEA's formal procedures will not always be indicative of the FAPE character of their claim); cf. Sophie G. by & through Kelly G. v. Wilson Cty. Sch., 742 F. App'x 73, 79 (6th Cir. 2018) (concluding that, although plaintiffs-appellants invoked the IDEA's administrative process, "[t]he gravamen of Plaintiffs' complaint [sought] access to subsidized childcare on equal terms, and not redress for the denial of a FAPE").

In this case, the history of the Doucettes' quest to secure their son access to his service animal does not suggest that the gravamen of their claim was the "meaningful[ness]" of his education, rather than nondiscriminatory access. See Fry, 137 S. Ct. at 755. The Doucettes first sought approval for B.D. to use his service animal without reference to his IEP. It was not until after the Doucettes refused to sign a school handling agreement, which they say violated the ADA, and B.D. was denied access to his service dog, that the school district ordered an IEP assessment to take place the following fall to determine whether B.D.'s IEP would be amended to include the use of a service animal for the fall 2012-spring 2013 school year. See supra Section I. Then, after B.D. suffered a life-threatening seizure, the Doucettes requested that the IEP amendment be implemented immediately.[16]

That the Doucettes invoked multiple laws in their efforts to obtain at-school access to a service animal for their

---

[16] The dissent argues that because the Doucettes requested an IEP amendment to include the service dog, and the request was denied, the Doucettes' section 504 claim is really about the denial of the IEP amendment. As a factual matter, as we explain, it was the school that initiated an IEP assessment as a possible way to address the service dog issue, not the Doucettes. To be sure, the complaint describes the educational consequences of the denial of the service dog, much like the example used by Justice Kagan in Fry about the relationship between the denial of wheelchair access and the educational consequences for a child. See Fry, 137 S. Ct. at 756. But an inadequate education is not the gravamen of the Doucettes' section 504 claim. Rather, it is the harm from the seizures that B.D. experienced as a result of denial of access to his service animal.

son is not surprising. A child who requires an accommodation under an IEP because, without it, his education would be inadequate, might also require that accommodation to safely access a public space. To illustrate this point, consider the hypothetical posed by the Supreme Court in Fry:

> Suppose . . . that a wheelchair-bound child sues his school for discrimination under Title II [of the ADA] . . . because the building lacks access ramps . . . . [A] different lawsuit might have alleged [an IDEA claim]: After all, if the child cannot get inside the school, he cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic . . . success. But is the denial of a FAPE really the gravamen of the plaintiff's Title II complaint? Consider that the child could file the same basic complaint if a municipal library or theater had no ramps . . . . That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education . . . . And so [the IDEA] does not require exhaustion.

137 S. Ct. at 756–57.[17]  In that example, the wheelchair-bound child may have been entitled to an IEP specifying that the school

---

[17]  The Court contrasts this example with a different hypothetical Title II claim:

> Suppose next that a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics.  That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation . . . . But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence -- even

would provide him with access ramps.  Even so, as the Court articulated, that possible entitlement does not imply that his Title II claim, premised on unequal access, is subject to IDEA exhaustion.

The reality is that many children who have limitations that require an accommodation under section 504 also have learning disabilities that entitle them to an IEP under the IDEA.  For instance, a child may have asthma and severe Attention Deficit Hyperactivity Disorder.  In such a case, school districts typically provide only an IEP for the child (and no section 504 plan), which would include all supports and services that the child needs -- even those that the child only requires for access purposes under section 504 (such as their asthma medicine).  See Office of Civil Rights, *Protecting Students with Disabilities: Frequently Asked Questions About Section 504 and the Education of Children with Disabilities*, U.S. Dep't of Ed. (Sep. 25, 2018), https://www2.ed.gov/about/offices/list/ocr/504faq.html ("If a student is eligible under IDEA, he or she must have an IEP.  Under the section 504 regulations, one way to meet Section 504 requirements . . . is to implement an IEP.").

---

though not its wording -- is the provision of a FAPE, thus bringing § 1415(*l*) into play.

137 S. Ct. at 756-57.

In many cases, parents may seek an IEP amendment to guarantee their child safe access to school because it is the most effective and direct way to get the child relief. But when something goes awry, and it has nothing to do with the delivery of a FAPE (the child might be hospitalized because her school failed to properly administer her medicine), the existence of the IEP does not alter the character of the child's section 504 claim.

To conclude otherwise would, in effect, place disabled school children in a disadvantaged position relative to their adult counterparts. Cf. Sagan v. Sumner Cty. Bd. of Educ., 726 F. Supp. 2d 868, 882-83 (M.D. Tenn. 2010) (finding exhaustion not required where, "if [the plaintiff] were not a disabled student, there would be no administrative barrier to her pursuit of these claims"). A teacher with epilepsy, who was not a student -- and therefore had no need for an IEP -- but used a certified service dog to aid him during seizures, would be able to challenge the deprivation of his service animal at the school without resort to the IDEA's administrative procedures. "If a disabled student would be able to make out a similarly meritorious [Rehabilitation Act] claim . . . it is odd to suggest that the IDEA would impose additional qualifications to sue, simply because [the plaintiff was a student]." Payne v. Peninsula Sch. Dist., 653 F.3d 863, 878-79 (9th Cir. 2011), overruled on other grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014).

In sum, the crux of the Doucettes' section 504 claim is simple discrimination, irrespective of the school district's FAPE obligation. The claim they bring could be brought by a non-student in a non-school public setting alleging the same injuries arising from the same deprivation. That claim is not subject to the exhaustion requirement of the IDEA.

## B. The Section 1983 Claim

The Doucettes' § 1983 claim is premised on an alleged violation of B.D.'s substantive due process rights secured by the Fourteenth Amendment.[18] The Doucettes allege that these rights were violated during the summer and fall of 2012 when the school district, "despite having actual notice that [Georgetown Public Schools] was an inappropriate placement for B.D., refused to allow an in-district or out-of-district placement and threatened the [Doucettes] with truancy in the event of any extended absences." They assert that this conduct amounted to "deliberate indifference and severe, pervasive disregard for [the] safety and well-being

---

[18] In the complaint, the Doucettes also asserted § 1983 claims premised upon violations of the equal protection and procedural due process clauses of the Constitution, as well as violations of the Rehabilitation Act and the IDEA's Child Find Mandate. The district court dismissed these claims, finding that the Doucettes had waived their due process and equal protection clause claims and that § 1983 claims may not be premised upon violations of the Rehabilitation Act or the IDEA, which are statutes with their own frameworks for damages. The Doucettes have waived these claims on appeal. See United States v. Mayendía-Blanco, 905 F.3d 26, 32 (1st Cir. 2018) (deeming claim waived where not raised in opening brief).

- 26 -

[of] B.D." and that, as a result, B.D. "suffer[ed] great physical and emotional harm," including "five [] life-threatening tonic-clonic seizures."

In contrast to the alleged deprivation of B.D.'s service animal, the Doucettes' demand for an alternative school placement, so central to their § 1983 claim, falls within the IDEA's exhaustion regime.[19]  A non-student could not make the same demand in a non-school setting.  See Fry, 137 S. Ct. at 756.  Moreover, the Doucettes previously made the same demand for an out-of-district placement for B.D. in an administrative hearing before the BSEA.  These "clues" provide "strong evidence that the substance of [the Doucettes' § 1983 claim] concerns the denial of a FAPE."  Id. at 757.  Indeed, the right to a school placement outside of the normal public-school system when an appropriate education is not otherwise possible arises from the IDEA's guarantee of a FAPE.  See Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 369 (1985); 603 C.M.R. § 28.06(2)(a) (requiring that a child's school placement "be based on the [child's] IEP").  With regard to this claim, however, we think

---

[19] Even if some of the Doucettes' substantive due process § 1983 allegations do not trigger IDEA exhaustion because they do not directly challenge the denial of a FAPE, but rather the surrounding circumstances, we do not further parse this claim because, as we explain infra, the claim in its entirety is in any event properly before us.

there is a good argument that the Doucettes met the exhaustion requirement.

The IDEA's administrative process contemplates a series of stages. The first stage is a meeting, or several meetings, between the parents of a child with a disability and the child's IEP team, during which the parents participate in discussions concerning the educational placement, evaluation, and accommodation of their child. See 20 U.S.C. § 1415(b)(1). During this phase, if a requested change in the child's placement or IEP is rejected, the school must provide written documentation of its reasons for doing so. See 34 C.F.R. § 300.503(a). That documentation must include, inter alia, "[a] description of the action . . . refused[;] . . . [a]n explanation of why the agency . . . refuses to take the action; [a] description of each evaluation procedure, assessment, record, or report the agency used as a basis for the . . . refused action[;] . . . [and a] description of other options that the IEP Team considered and the reasons why those options were rejected." Id. § 300.503(b). In Massachusetts, if parents are dissatisfied with the result of the meeting or meetings, they may then "bring the dispute to the attention of local public school officials" by "contact[ing] [their] school [p]rincipal, the Administrator of Special Education, or [their] superintendent." Mass. Dep't Special Educ., Parents Notice of Procedural Safeguards 7 (2013), available at

http://www.doe.mass.edu/sped/prb/pnps.pdf; see 603 C.M.R. § 28.08(1). If the problem cannot be resolved locally, the parents may file a formal complaint with the administrative agency designated by the state, the filing of which will initiate a formal hearing and administrative decision. See 20 U.S.C. § 1415(b)(6), (f).

The Doucettes first invoked these procedures in 2010. Specifically, they initiated the process in March of that year by meeting with B.D.'s IEP team to request an alternative placement for B.D. They then brought "the dispute to the attention of local public school officials" by "contact[ing] [their] school [p]rincipal . . . [and] superintendent." Ultimately, in early July, they filed a Request for Hearing with the BSEA seeking an out-of-district placement for B.D. A hearing was held at the end of August and an order was issued in September. In that instance, the Doucettes did not get the relief that they sought, i.e., an alternative placement for B.D. If the Doucettes had at that time filed a civil action seeking the alternative placement denied to them administratively, a district court plainly would have had authority to hear the case because they went through the entire administrative process unsuccessfully.

This appeal concerns the Doucettes' second use of the administrative process in the summer of 2012. In July, they again requested an alternative educational placement for B.D. through an

amendment to his IEP.  The Doucettes again brought the dispute to the attention of local public school officials.  The superintendent advised the Doucettes that their request should be resolved by B.D.'s "[IEP] team" with "input from medical personnel," and that the Doucettes should "work with [the local public school officials] to determine if compensatory services were going to be offered" and whether an "out-of-school placement" was required.  As instructed, the Doucettes provided a letter from B.D.'s doctor to their local school officials, including the principal of B.D.'s school.  In addition, Massachusetts General Hospital filed a 51A report, see Mass. Gen. Laws ch. 119, § 51A, citing suspected neglect of B.D. by the school district.  The Doucettes then met again with B.D.'s IEP team.  Following the meeting, B.D.'s IEP was amended and he was placed at an alternative school.

Thus, in 2012, the Doucettes engaged in the administrative process until they received the relief that they sought (and the only relief available to them through the IDEA's administrative process) -- an alternative placement for B.D. and compensatory educational services.  See, e.g., Sch. Comm. of Burlington, 471 U.S. at 369-71 (explaining that the only relief available through the IDEA's administrative process is future special education services and reimbursements to parents for education-related expenditures).  Having achieved success through their interactions with local school officials, there was no need

for the Doucettes to seek a hearing before the BSEA.  Hence, the steps they took exhausted their FAPE demand for an alternative placement.  Cf. Mass. Gen. Laws ch. 71B, § 2A.[20]

Still, their success in the administrative process is not the end of the story for the Doucettes concerning B.D.'s placement.  The premise of their § 1983 claim is that, while successfully pursuing the out-of-district placement, B.D. suffered harm from the delay in receiving the administrative relief.  The Doucettes brought their constitutional claim only after they had no further "remedies under the IDEA to exhaust," Blanchard v.

---

[20] The dissent dismisses the significance of this negotiated success, asserting the absolute rule that "[e]xhaustion requires that a party receive a determination through a due process hearing, as contemplated under section 1415(f)."  Surely the dissent does not mean that the Doucettes had to pursue a further administrative hearing to get what they had already obtained in "informal[] . . . '[p]reliminary meeting[s].'"  See Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (second alteration in original) (quoting § 1415(f)(1)(B)(i)).  The dissent must mean, then, that the § 1983 claim itself had to be presented at an administrative due process hearing -- i.e., that the Doucettes were required to present their claim for damages arising from the delay in an alternative school placement for B.D. in such a hearing before bringing the claim in federal court.  Yet, in the administrative hearing envisioned by the dissent, where the issue would be the impact of the delay in granting the alternative school placement, the hearing officer would have no authority to grant relief even if the Doucettes were successful in establishing their claim.  Although Fry left open the question of whether a plaintiff must exhaust a claim for physical or emotional harms arising from a FAPE denial, the Court recognized the incongruity of demanding exhaustion when "[a] hearing officer . . . would have to send [a plaintiff] away empty-handed."  137 S. Ct. at 754.  That is exactly what would happen to the Doucettes under the dissent's scenario.

Morton Sch. Dist., 420 F.3d 918, 921-22 (9th Cir. 2005), overruled on other grounds by Payne v. Peninsula Sch. Dist., 653 F.3d 863 (9th Cir. 2011), and they now seek damages for the harms B.D. experienced while being forced to wait for that relief. The IDEA itself permits the Doucettes to seek any relief available to them under the "other [f]ederal laws that protect the rights of children with disabilities." 20 U.S.C. § 1415(*l*). And, by its terms, § 1415(*l*) does not appear to require exhaustion of the Doucettes' constitutional claim because that claim does not "seek[] relief that is also available under [the IDEA.]" Id.

However, in Fry, the Supreme Court left open the question of whether "exhaustion [is] required when [a] plaintiff complains of the denial of a FAPE, but the specific remedy she requests" -- such as money damages for physical or emotional harm -- "is not one that an IDEA hearing officer may award." 137 S. Ct. at 752 n.4. As we have explained, the denial of a FAPE is part of the Doucettes' constitutional claim in the sense that the delay in obtaining an alternative placement for B.D. allegedly caused the child physical and emotional injuries. Nonetheless, to the extent the Doucettes should have aired their constitutional claim through the administrative process, enforcing the exhaustion requirement is unnecessary here because the circumstances establish the futility of such additional proceedings.

The legislative history of the IDEA shows a special concern with futility. "Senator Williams, the principal author of the Education of the Handicapped Act, the predecessor statute to IDEA, stated that 'exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter.'" Weber v. Cranston Sch. Comm., 212 F.3d 41, 52 n.12 (1st Cir. 2000) (quoting 121 Cong. Rec. 37416 (1975)). Futility applies when (1) the plaintiff's injuries are not redressable through the administrative process, Rose, 214 F.3d at 210-11, and (2) the administrative process would provide negligible benefit to the adjudicating court, see Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1094 (1st Cir. 1989) (concerning exhaustion requirement under the IDEA's predecessor statute, the Education for All Handicapped Children's Act).[21]

---

[21] We take particular exception to the dissent's suggestion that we have created a novel futility test. To the contrary, we have applied precisely the test that our precedents prescribe. See, e.g., Rose, 214 F.3d at 210-11; Weber, 212 F.3d at 52. The dissent maintains that we think futility has been established if the plaintiff seeks only money damages and the administrative officer is not authorized to afford that type of relief. To the contrary, our analysis includes the additional requirement of the negligible benefit of the administrative hearing to a reviewing court.

As to redressability, here, the Doucettes request money damages for medical expenses arising from B.D.'s seizures and the physical, emotional, and psychological harm that B.D. experienced because of the school district's "severe, pervasive disregard for [the] safety and well-being [of] B.D."  Section 1983 authorizes such forms of relief.  See 42 U.S.C. § 1983.  On the other hand, the relief available under the IDEA is equitable and is limited to (1) future special education and related services to ensure or remedy a past denial of a FAPE; and (2) reimbursements to parents for education-related expenditures that the state ought to have borne.  See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 125 (1st Cir. 2003).  The Supreme Court has expressly distinguished such reimbursements from "damages," Sch. Comm. of Burlington, 471 U.S. at 370, which the IDEA does not allow.  Nieves-Marquez, 353 F.3d at 125.[22]

---

[22] The dissent contends that the Doucettes have not made a futility showing because they have not "demonstrated that no additional relief was available to them through a due process hearing at any time after the summer of 2017."  We do not understand the relevance of this point.  The Doucettes are not seeking any further compensatory relief or an alternative placement, so how can they be charged with failing to demonstrate the futility of pursuing such additional relief?  Indeed, in determining whether a plaintiff must exhaust her claim for relief under the IDEA, we look at the "remedial basis" identified by the plaintiff rather than what relief she "could have sought."  Fry, 137 S. Ct. at 755 (internal quotation marks omitted).  Moreover, as we explain, although an adjudicating court may benefit from the record provided by an administrative hearing, further record development is not

Finally, although adjudication of FAPE-based claims typically benefits from the administrative process because courts rely on "the detailed evidentiary record developed during the due process hearing," and because "[t]he IDEA's administrative machinery places those with specialized knowledge -- education professionals -- at the center of the decisionmaking process," Frazier, 276 F.3d at 60-61, the benefits of further administrative decisionmaking would be negligible in this case.

The Doucettes' § 1983 claim involves liability and damages issues. Liability depends upon a finding that the school district acted with "deliberate indifference." See Manarite v. City of Springfield, 957 F.2d 953, 955 (1st Cir. 1992). On that issue, which concerns the decisionmaking process of B.D.'s educators and school officials, an adjudicating court already has the benefit of the administrative record developed during the 2010 due process hearing in which the Doucettes sought an alternative placement for B.D, as well as the required documentation from the Doucettes' 2012 pursuit of an alternative placement for B.D. The latter records include school officials' documented reasons for continuing B.D.'s placement within the school district during the summer of 2012, and the final amended IEP, explaining the school

---

necessary in this case because of the documentation already available from the administrative processes in 2010 and 2012.

officials' reasons for B.D.'s ultimate placement outside of the district.  All of this documentation provides the educational expertise needed by an adjudicating court.

The damages aspect of the claim concerns issues of medical causation -- not educational issues that are the administrative body's area of expertise.  Cf. McCormick v. Waukegan Sch. Dist. No. 60, 374 F.3d 564, 569 (7th Cir. 2004) (no exhaustion required where plaintiff alleged "permanent physical injuries"); Padilla ex rel. Padilla v. Sch. Dist. No. 1 in City & Cty. of Denver, Colo., 233 F.3d 1268, 1274 (10th Cir. 2000) (no exhaustion required where plaintiff's claim involved only physical injuries). Medical causation questions are routinely considered by district courts and juries, assisted by the testimony of medical experts, without the benefit of an administrative record.  Thus, no educational expertise is needed for a court to adjudicate the damages aspect of the § 1983 claim.

For these reasons, even if the Doucettes' § 1983 is subject to further exhaustion, requiring the Doucettes to take further administrative action would be an "empty formality." Panetti, 551 U.S. at 946.  Given the steps that the Doucettes took and the relief that they received, further invocation of the administrative process as to their § 1983 claim was not required,

and the district court erred in granting judgment to the school district on that ground.

## IV.

For the foregoing reasons, we vacate the district court's entry of judgment for the school district and remand for further proceedings consistent with this opinion.[23]  The district court should reconsider its remand of the state law claims in light of this disposition.  Costs to appellants.

So ordered.

-Dissenting Opinion Follows-

---

[23] In response to the dissent's final footnote, we note only that our footnotes reflect good-faith engagement with the dissent's analysis.  We, too, are "content to leave the relative merits" of our competing views for others to evaluate.

**SELYA**, <u>Circuit Judge</u> **(dissenting).** When Congress crafted an exhaustion requirement for the IDEA, it envisioned that requirement as robust. See <u>Frazier</u> v. <u>Fairhaven Sch. Comm.</u>, 276 F.3d 52, 60 (1st Cir. 2002) ("Congress constructed the law on the premise that plaintiffs would be 'required to utilize the elaborate administrative scheme established by the [IDEA] before resorting to the courts to challenge the actions of the local school authorities.'" (alteration in original) (quoting <u>N.B. by D.G.</u> v. <u>Alachua Cty. Sch. Bd.</u>, 84 F.3d 1376, 1378 (11th Cir. 1996)(per curiam))). The Supreme Court's interpretive guidance has been faithful to the congressional mandate. See <u>Fry</u> v. <u>Napoleon Cmty. Schs.</u>, 137 S. Ct. 743 (2017). In the case at hand, though, the majority dilutes the exhaustion requirement, making it easy to evade and — where evasion cannot be accomplished even under the majority's relaxed standard — easy to satisfy. Not surprisingly, this parade of errors leads to an incorrect result. Because I do not share the majority's somewhat cavalier view of the IDEA's exhaustion requirement, I respectfully dissent.

## <u>I</u>

I start with the majority's erroneous conclusion that the gravamen of the plaintiffs' Rehabilitation Act claim "involves the denial of non-discriminatory access to a public institution, irrespective of the school district's FAPE obligation to provide a particular education program" for their son. <u>Ante</u> at 17. This

conclusion derives from a confused assessment of the directives contained in Fry. The majority seems not to recognize that the two "clues" adumbrated by the Fry Court, see 137 S. Ct. at 756-57, are merely devices intended to assist an inquiry into whether the plaintiffs "seek relief for the denial of a FAPE," id. at 752; cf. id. at 759 (Alito, J., concurring in part and concurring in the judgment) (calling the clues "misleading" and warning that they "are likely to confuse and lead courts astray").

The Fry Court first concluded that the complaint before it contained no explicit focus on the adequacy of the education received by the petitioners' daughter, noting that the "complaint allege[d] only disability-based discrimination, without making any reference to the adequacy of the special education services" that the school furnished. Id. at 758. Because "the FAPE requirement provides the yardstick for measuring the adequacy of the education that a school offers to a child with a disability," id. at 753, the Court considered both whether the complaint referred to the denial of a FAPE and whether it otherwise challenged the adequacy of the education that the petitioners' daughter received, id. at 758. Not only did the complaint "contain[] no allegation about the denial of a FAPE or about any deficiency in [the petitioners' daughter's] IEP" but also failed to "accuse the school even in general terms of refusing to provide the educational instruction and services" required by the petitioners' daughter. Id.

Relatedly, the Court emphasized that the petitioners had continued to maintain throughout the litigation that their daughter's educational needs were satisfied. See id.

But even though the complaint revealed no explicit focus on the adequacy of the daughter's education, the Court was not satisfied that the petitioners could circumvent the IDEA's exhaustion requirement. At that point in its analysis, the Court employed its two "clue[s]" to help discern whether the complaint contained an "implicit focus" on educational adequacy. Id. at 756-58. Investigating the first clue (the hypotheticals), the Court noted that the same complaint could be filed against a public facility that was not a school or could be filed against the school by a non-student plaintiff, in either of which events it "would have nothing to do with the provision of educational services." Id. at 758. Investigating the second clue (the petitioners' pursuit vel non of the IDEA's administrative remedies) turned out to be a dead end because the record was insufficiently developed as to that issue. See id. And notwithstanding the absence of any other indication that the petitioners sought relief for the denial of a FAPE, the Court deemed it necessary to remand in order to gain insight into this issue. See id. at 758-59. In that regard, it instructed the court below to establish whether the petitioners had invoked the IDEA's dispute resolution process. See id.

In demonstrating how a court should cut through the boilerplate of the pleadings and determine whether a plaintiff is actually seeking relief for the denial of a FAPE, the Fry Court imparted some useful guidance.  Mindful that the plaintiff is the "master of the claim," id. at 755 (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 392, and n.7 (1987)), a reviewing court's examination should begin with the four corners of the complaint, see id. at 758.  Taking this approach in a very recent case, we determined that the plaintiffs' pleadings and legal allegations revealed that their complaint alleged the denial of a FAPE and was therefore subject to the IDEA's exhaustion requirement.  See Parent/Prof'l Advocacy League v. City of Springfield, ___ F.3d ___, ___ (1st Cir. 2019) [Nos. 18-1778, 18-1813, 18-1867, 18-1976, slip op. at 21-22].

If however, a reviewing court is unable to identify an explicit focus on the adequacy of the education received by a child with disabilities, it must then take the next step.  That step entails consideration of whether an implicit focus can be identified (either in the complaint or in the proceedings), employing means such as the two Fry clues.[24]  See Fry, 137 S. Ct. at 758-59; see also Fry v. Napoleon Cmty. Schs., No. 12-15507,

---

[24] Of course, a court may also take the step in order to buttress the identification of such an explicit focus.  See, e.g., City of Springfield, ____ F.3d at ____ [slip op. at 22-23].

- 41 -

2018 WL 4030757, at *14-16 (E.D. Mich. Aug. 23, 2018) (applying on remand the inquiry delineated by the Fry Court). Only if the court determines that a particular claim cannot be interpreted to allege the denial of a FAPE, either explicitly or implicitly, can the court find that the claim is not subject to the IDEA's exhaustion requirement.

I confess that the Fry Court's instructions about how to read and interpret a complaint are not a model of clarity. Although cautioning against a "magic words" approach and warning that the inquiry "does not ride on whether a complaint includes (or, alternatively, omits) the precise words . . . 'FAPE' or 'IEP,'" Fry, 137 S. Ct. at 755, the Court indicated that the absence of any allegations referring either to the denial of a FAPE or to some deficiency in an IEP would be meaningful data points supporting a determination that the petitioners' complaint alleged "only disability-based discrimination," id. at 758. Fairly read, the Fry Court's approach strongly suggests that the presence of such terms, though they do not serve as on/off switches, ought to play an important role in any determination as to whether a plaintiff is, in essence, seeking relief for the denial of a FAPE.

Fry mentions another consideration relevant to assessing a complaint: the relationship between an individual claim and the complaint as a whole. See id. In light of this consideration,

the Court's evaluation of the complaint was influenced by the absence of any allegation, either specific or general, that the school "refus[ed] to provide the educational instruction and services" required by the petitioners' daughter. Id. But Fry leaves open a question: does the presence of such allegations affect the court's assessment of all claims in a complaint or, conversely, can such allegations be cordoned off as relevant only to particular claims that explicitly seek relief for FAPE denial?

In the aftermath of Fry, this unanswered question was addressed by the Third Circuit in Wellman v. Butler Area School District, 877 F.3d 125 (3rd Cir. 2017). There, the court held that Fry requires courts to review the entire complaint and conduct a separate assessment of each claim. See id. at 133. The court added that, regardless of whether a complaint includes FAPE denial allegations, an entirely distinct claim that in no way concerns the denial of a FAPE (like an allegation of physical assault on a school bus) would fall outside the IDEA's exhaustion requirement. See id. at 132-33. On these points, I think that the Wellman court got it exactly right.

The Third Circuit, though, was more chary with respect to a claim nested among explicit claims of a FAPE denial — a claim which, like the claim in Fry, did not explicitly allege the denial of a FAPE but necessitated further analysis to determine whether an implicit focus nonetheless lurked beneath its surface. See id.

- 43 -

at 134.  I find the Wellman court's handling of such a claim instructive.

In relevant part, the Wellman plaintiff sought "relief under the ADA and Rehabilitation Act due to the school's alleged failure to ensure that [he] was not exposed to danger after the initial head injury he sustained during physical education class but was still permitted to participate in school activities." Id. Though recognizing that "there could be a scenario in which these events may not relate to a FAPE," the court determined that, as pleaded, the claim "was offered as another example of how the school failed to accommodate [the plaintiff] so that he could benefit from his educational experience." Id. Because the factual allegations surrounding this claim were intermixed with explicit claims charging FAPE denial, the court concluded that the complaint sought relief for failure to provide a FAPE.[25]  See id.  The relationship between a complaint's explicit allegations of a FAPE denial and other claims limned in the complaint provides yet another clue that can identify an implicit focus on the adequacy of the education received.

_____

[25] For the sake of completeness, I note that after assessing this claim in relation to the entire complaint, the Wellman court bolstered its conclusion that the claim concerned a FAPE denial by pointing out that the claim "could not be brought by a nonstudent or outside the school setting."  877 F.3d at 134.  This approach tracks with my view that the Fry "clues," while not necessary, may provide additional data points to reinforce a determination that a claim concerns (or does not concern) a FAPE denial.

In this case, the lessons of Fry and Wellman compel the conclusion that the plaintiffs' Rehabilitation Act claim seeks relief for the denial of a FAPE. When mounting this claim, the plaintiffs alleged that the school's "refusal to permit B.D. access to his service dog in his educational setting was illegal disability-based discrimination that violated Section 504." The plaintiffs then alleged that "[o]nly after he suffered a life-threatening tonic-clonic seizure did the defendants agree that B.D. could bring the service dog to school, but not as an accommodation under his IEP." In short, the plaintiffs set forth a composite claim concerning their son's service dog: that for a period of time the school denied B.D. any access to a service dog at school; and then, belatedly, granted B.D. access to the dog but refused to accommodate him by amending his IEP accordingly.[26]

Although the first portion of this composite claim does not explicitly allege a FAPE denial, the second portion comprises a direct challenge to the adequacy of the educational services offered by the school. The plaintiffs allege that the school refused to amend B.D.'s IEP to include his service dog, which (they say) he required in order "to develop some independence and

---

[26] Unlike the majority, I do not speculate about whether the service dog accompanied B.D. at school after his first seizure. For purposes of an access or accommodation claim under the Rehabilitation Act, the relevant questions are whether B.D. was permitted to bring the dog to school and under what conditions. Anything else is window dressing.

confidence" and to alleviate his anxiety in social settings.  It defies reason to turn a blind eye to the plaintiffs' reference to the IEP in this context — and that reference quite clearly reveals the plaintiffs' implicit focus on the school's alleged failure to accommodate their son's educational needs.

This conclusion is reinforced by a more detailed evaluation of the pleaded Rehabilitation Act claim, which itself discloses an implicit focus on the adequacy of the educational services received by B.D.  Viewing the Rehabilitation Act allegations in relation to the entire complaint, the Rehabilitation Act claim appears inextricably intertwined with the plaintiffs' concerns about the school's failure to accommodate B.D.'s educational needs.  Specifically, the factual allegations set forth in the complaint trace the school's alleged intransigence in responding to the plaintiffs' concerns as well as its refusal either to implement B.D.'s IEP or to amend the IEP to incorporate necessary measures.  As a result of this myriad of educational inadequacies, the complaint alleges, B.D. experienced five seizures.[27]

---

[27] The majority apparently recognizes that the bulk of the plaintiffs' allegations — "that the ESY summer 2012 program was not an appropriate placement for B.D., that the program was understaffed, that his aides were unqualified and a teacher undertrained, and/or that the interventions required under his IEP were not being implemented" — concern the denial of a FAPE.  See ante at 27-28.  But the majority then proceeds to ignore both the

- 46 -

Given these contextual surroundings, it is apparent to me that the plaintiffs' claim regarding the school's refusal to cooperate with their requests concerning the service dog is best understood as a challenge to the adequacy of their son's education. And since the complaint itself resolves any question as to whether the plaintiffs allege the denial of a FAPE, it is neither necessary nor useful to explore the potential significance of the Fry clues. Even so, I note that an allegation that a school refused to accommodate a student by amending his IEP to include a service dog could neither be brought outside the school setting nor by a nonstudent. This, too, weighs in favor of the conclusion that the Rehabilitation Act claim is sufficiently linked to the denial of a FAPE. I would therefore hold — as did the court below — that the plaintiffs' Rehabilitation Act claim is sufficiently within the orbit of the IDEA to activate the IDEA's exhaustion requirement.[28]

## II

This brings me to the plaintiffs' section 1983 claim. The majority concludes that this claim was "properly brought in

---

legal significance and the logical implications of what it has just recognized.

[28] I do not read the majority opinion as holding that exhaustion of this claim should be excused on the basis of futility. At any rate, it should be evident from what I say below, see infra Part II.B, that the futility exception has no bearing here.

federal court because it either was exhausted or [because] further invocation of the administrative process would have been futile." Ante at 16.  I find neither of these grounds persuasive.

The exhaustion requirement, see 20 U.S.C. § 1415(*l*), serves a critical role within the IDEA's administrative regime. Insisting on such a requirement "forces parties to take administrative proceedings seriously, allows administrative agencies an opportunity to correct their own errors, and potentially avoids the need for judicial involvement altogether." Frazier, 276 F.3d at 60 (quoting P. Gioioso & Sons, Inc. v. OSHRC, 115 F.3d 100, 104 (1st Cir. 1997)).[29]  In the IDEA setting, there are "special benefits" to an exhaustion requirement:  "The IDEA's administrative machinery places those with specialized knowledge—education professionals—at the center of the decisionmaking process, entrusting to them the initial evaluation of whether a

---

[29] The majority avers that Frazier's "exhaustion analysis is of questionable precedential value because it relied on a Supreme Court case addressing exhaustion in the context of the [PLRA]." Ante at 13 n.10.  In point of fact, the Fry Court made only a passing reference to the PLRA, distinguishing that statute's exhaustion provision in order to emphasize that the IDEA enables a plaintiff to decide whether to seek the "relief available under the IDEA" — relief for the denial of a FAPE.  See Fry, 137 S. Ct. at 755.  The Court did not by any means indicate that case law interpreting the PLRA's exhaustion provision should not be read to inform a court's interpretation of section 1415(*l*), and it explicitly left open the very question for which Frazier viewed that case law as instructive:  whether exhaustion is required where the specific remedy requested "is not one that an IDEA hearing officer may award."  Id. at 752 n.4.

disabled student is receiving a free, appropriate public education." Id.

If courts are to be faithful to Congress' commands, they cannot allow the IDEA's exhaustion requirement to be easily dodged. To this end, "[t]he burden of demonstrating an exception from the exhaustion requirement falls on the party seeking to avoid the requirement." Rose v. Yeaw, 214 F.3d 206, 211 (1st Cir. 2000); see Honig v. Doe, 484 U.S. 305, 327 (1988).

## A

Viewed against this backdrop, the majority's conclusion that the plaintiffs have exhausted their administrative remedies is flat-out wrong. The majority asserts that the plaintiffs exhausted their administrative remedies vis-á-vis their section 1983 claim when they requested and received an out-of-district placement in the fall of 2012. See ante at 30-31. Adding a wrinkle to the analysis, the majority labors to treat that initial request as separate and distinct from the section 1983 claim for monetary relief, characterizing the latter as merely an effort to obtain "damages for the harms B.D. experienced while being forced to wait for" the relief initially requested. Id. at 32. Finally, the majority posits that because the initial request was exhausted, the section 1983 claim needed no additional exhaustion. See id.

The majority's reasoning rests on a porous foundation. The plaintiffs' initial request was not exhausted because it did

not move beyond the superintendent of the school district before it was resolved by the school's acquiescence.[30] Simply raising a concern successfully through the bureaucracy of the school district, without more, does not comprise exhaustion. See A.F. ex rel Christine B. v. Española Pub. Schs., 801 F.3d 1245, 1249 (10th Cir. 2015) (rejecting argument that mediation settlement comprised IDEA exhaustion).

Exhaustion requires that a party receive a determination through a due process hearing, as contemplated under section 1415(f). See Weber v. Cranston Sch. Comm., 212 F.3d 41, 53 (1st Cir. 2000) (concluding that "IDEA's mandate is explicit: plaintiffs must exhaust IDEA's impartial due process hearing procedures" before repairing to court); see also Z.G. by & through C.G. v. Pamlico Cty. Pub. Sch. Bd. of Educ., 744 F. App'x 769, 776 (4th Cir. 2018) ("The plaintiff has exhausted administrative remedies under 20 U.S.C. § 1415(*l*) when he receives a finding or a decision from the Review Officer."). Only then may a party "bring a civil action with respect to the complaint presented pursuant to this section." 20 U.S.C. § 1415(i)(2)(A).

---

[30] For this reason, I need not address the majority's curious bifurcation of two requests for relief that, in my view, stem from the same alleged denial of a FAPE. I do note, however, that if a school's refusal to grant a party's request for relief based on allegations of FAPE denial could give rise to a separate claim that required no agency determination as to whether that FAPE denial occurred, the exhaustion requirement would be emptied of all meaning.

By this measure, the plaintiffs' initial request for relief was not exhausted.  Nor can it seriously be argued that the section 1983 claim for monetary relief, if treated as distinct from the initial request for relief, was exhausted in its own right.  There has been no agency determination as to whether the school denied B.D. a FAPE during the relevant period — and without such a determination, there can be no exhaustion.  See Weber, 212 F.3d at 53.  It follows inexorably that the plaintiffs have not carried their burden of demonstrating that they have complied with the IDEA's exhaustion requirement as to their section 1983 claim.

**B**

The majority concludes, in the alternative, that the plaintiffs were not required to resort to the IDEA's administrative procedures prior to filing suit because they have demonstrated the futility of such an attempt to exhaust.  I agree that futility may, in an appropriate case, excuse compliance with the exhaustion requirement.  See Frazier, 276 F.3d at 59.  Here, however, the majority generates a test for futility that is of dubious provenance and, in the bargain, applies it in a manner that directly contradicts our precedent.

The cases that the majority cites for the proposition that "[f]utility applies when (1) the plaintiff's injuries are not redressable through the administrative process, and (2) the administrative process would provide negligible benefit to the

adjudicating court," ante at 33 (internal citation omitted), simply do not support that proposition. To the contrary, our precedent regarding futility requires plaintiffs to demonstrate that the administrative process "does not provide relief that addresses the claim of the complainant." Weber, 212 F.3d at 52. This approach dovetails with established law, holding that parties cannot show futility merely by arguing that their complaint seeks money damages and that such a remedy is not available under the IDEA. See Frazier, 276 F.3d at 56. As Frazier teaches, exhaustion may be beneficial (and, therefore, compulsory) "regardless of whether the administrative process offers the specific form of remediation sought by a particular plaintiff." Id. at 61. Consequently, we cannot "allow a plaintiff to bypass the administrative procedures merely by crafting her complaint to seek relief that educational authorities are powerless to grant." Id. at 63.

The majority concludes, under its novel test, that B.D.'s injuries are not redressable through the administrative process because the plaintiffs seek only money damages and the BSEA is not authorized to award that type of relief. See ante at 34. Frazier precludes such a conclusion. See 276 F.3d at 56. In line with the Weber test, we are instructed to consider whether the plaintiffs have demonstrated that the BSEA cannot award relief

that addresses their claim that B.D. was denied a FAPE.  They have
not done so.

The proper test demands that we return to the summer of
2012.  See Nelson v. Charles City Cmty. Sch. Dist., 900 F.3d 587,
594 (8th Cir. 2018) ("In determining whether a plaintiff was
required to exhaust remedies . . . we must consider the student's
status at the time of the challenged conduct when the parents could
have invoked administrative procedures."); see also Frazier, 276
F.3d at 63.  At any time that summer, the plaintiffs could have
filed a complaint with the BSEA seeking multiple forms of relief
for the alleged denial of a FAPE, including an out-of-district
placement and compensatory services.  That they chose instead to
negotiate with the school in the autumn of 2012 to receive the
same relief is irrelevant to the correct futility analysis.

Nor have the plaintiffs demonstrated that no additional
relief was available to them through a due process hearing at any
time after the summer of 2012.  For example, compensatory education
is a remedy that is available even when a student no longer attends
a specific school.  See Frazier, 276 F.3d at 63.  Here, we know
that the school already has offered some compensatory services to
the plaintiffs, but the plaintiffs have not provided any
information as to what that offer comprised or whether it was
accepted.  And even if the offer was accepted, there is no reason

that the BSEA could not award relief in the form of additional compensatory services.

What is more, requiring the plaintiffs to seek a due process hearing before the BSEA "facilitates the compilation of a fully developed record by a factfinder versed in the educational needs of disabled children—and that record is an invaluable resource for a state or federal court required to adjudicate a subsequent civil action covering the same terrain." Id. at 61. A court attempting to grapple with the plaintiffs' section 1983 claims, then, would benefit from reviewing an administrative record in which the adequacy of educational services provided by the school has been assessed.

For these reasons, I conclude that the plaintiffs have not carried their burden of establishing that exhaustion of the IDEA's administrative process would be futile as to their section 1983 claim. The district court, therefore, acted appropriately in granting the defendants' motion for judgment on the pleadings.

### III

To say more would be to paint the lily.[31] The majority treats the IDEA's exhaustion requirement as little more than a

---

[31] The majority, in a lengthy string of footnotes, has attempted to respond to this dissent. As far as I can tell, that attempt proceeds mainly by distorting what the dissent says and the propositions for which the dissent stands. Rather than engaging in hand-to-hand combat and replying point by point to these distortions, I am content to leave the relative merits of

mere annoyance, which can be both too easily satisfied and too easily evaded.  In my view, proper application of the exhaustion requirement compels affirmance of the judgment below.  Because the majority erroneously reaches a contrary conclusion, I respectfully dissent.

---

the majority opinion and the dissent to the fair-minded and informed reader.